# STUBBS ET AL. *v.* THE BANKERS LIFE ASSOCIATION.

[No. 7,911.   Filed April 16, 1913.   Rehearing denied February 26, 1914.]

1.   INSURANCE.—*Mutual Benefit Insurance.—Forfeiture for Nonpayment of Assessments.*—Where the provisions of an assessment insurance association as disclosed by its articles of incorporation, by-laws and contract of insurance, as well as the provisions of a note required to be executed by the applicant for insurance, relating to what was designated as a "guarantee deposit", though containing language which alone might indicate that each assessment for mortuary purposes should be levied *pro rata* on the "guarantee deposit" of each member, when considered as a whole,

and in view of the general plan of the association, showed that such was not the purpose of such "guarantee deposit", but that it was designed to guarantee the member's payment of his assessments and as a protection to the beneficiaries of those who did not default in their assessments, a finding and judgment against plaintiff in an action on a certificate issued by such association was correct, where it appeared that the insured died before the maturity of his note given on account of the "guarantee deposit" and without having paid the assessments levied against him, and plaintiff's right to recover was based on the contention that forfeiture was prevented by virtue of the provisions relating to such "guarantee deposit". p. 585.

From Boone Circuit Court; *Willett H. Parr*, Judge.

Action by Mignon Stubbs and another against The Bankers Life Association. From a judgment for defendant, the plaintiffs appeal. *Affirmed.*

*Ira W. Sharp*, for appellants.
*Wiley & Jones* and *I. M. Earle*, for appellee.
*Guilford H. Deitch* and *Frank G. West*, Amici Curiae.

ADAMS, J.—This cause was submitted to the court below on an agreed statement of facts. Among the facts so agreed on, essential to a determination of the question presented by the record before us, are the following: Appellee, The Bankers Life Association, is an Iowa corporation authorized to do an assessment life insurance business. It is not organized for pecuniary profit, it has no capital stock, and depends on assessments paid by its members for the settlement of death losses. The appellee was admitted to do business in Indiana prior to May 8, 1908, and on said date issued a certificate of membership to one Fred Graves for $2,000, in which certificate appellants were named as beneficiaries. On the acceptance of his application, Fred Graves paid the sum of $14, as a membership fee, into the contingent or expense fund, and executed to appellee his note for $28, due and payable in four equal instalments, the first instalment falling due October 1, 1909, which note was accepted by appellee in lieu of cash, became applicant's guarantee de-

posit, and a part of the guarantee fund. The certificate of membership *inter alia* provides that "Upon the failure of the above named member to make any payment due from him to the association at its maturity in January, April, July and October of each year, his guarantee deposit and all other payments made shall be forfeited, and his membership shall thereupon cease." The association insures only its members, and the contract of membership in the association consists of the written application, the certificate issued thereon, the articles of incorporation and the by-laws of the association. Article 2 of the articles of incorporation is as follows:

"The business of this association shall be conducted upon the mutual assessment plan, in which the payment of all assessments shall be secured by a guarantee fund, contributed by each member *pro rata* according to age at entry; this guarantee fund, together with the insurance provided in the certificate of membership and by-laws of the association, to be forfeited upon failure of a member to pay his assessments within the time prescribed by the by-laws of the association, provided, however, that relief from such forfeiture and provision for reinstatement of lapsed members may be made by the Board of Directors."

Art. 10 of said articles of incorporation is as follows:

"Section 1. The funds of the association shall be kept separate and distinct upon the books thereof, and shall be designated as follows, to wit: The Guarantee Fund, the Benefit Fund, the Reserve Fund and the Contingent Fund, and such other funds as the Board of Directors may hereafter establish. Section 2. The Guarantee Fund shall consist of the deposits pledged by each member of the association for the prompt payment of assessments and the said deposit required of each member shall consist of the sum of one dollar for each year of the age of member at date of application, counted at nearest birthday, and may consist of cash or a note at 4 per cent interest, payable on such terms as the Board of Directors may prescribe, and the said Board shall have the power to declare a certificate of membership void and of no effect upon defalcation of

payment for any note executed for said deposit. Section 3. The benefit fund shall consist of all moneys collected for the payment of losses occasioned by the death of members of the association, and shall be collected by *pro rata* assessments levied by the Board of Directors upon the guarantee fund of the association. Section 4. The reserve fund shall consist of all guarantee deposits forfeited to the association by lapsed members, and the interest accruing from all funds of the association of whatever nature; all gains, discounts, and margins realized on sale of bonds and mortgages on real estate taken under foreclosure or otherwise and all unused surplus arising from the contingent fund and all other sources. This reserve shall be set apart as an emergency fund for the purpose of providing for death losses in excess of one per cent per annum of the membership of the association, and for the further purpose of temporary advances for the payment of death losses when the benefit fund is exhausted. Section 5. The contingent fund shall consist of all moneys collected for the purpose of defraying the expenses connected with the transaction of the business of the association, and shall be composed of the membership fee, a sum equal to fifty per cent of the guarantee deposit of each member, to be paid on admission, and an annual tax of ten per cent on the guarantee deposit for expenses, to be collected in such installments and at such times as the Board shall direct, provided, that the Board may increase these fees and annual expense items at their discretion, but no such increase shall affect members admitted prior thereto. Section 6. Each fund shall be used expressly for the purpose indicated in the foregoing sections of this article respectively, and no appropriation shall be made of one fund for the purpose of paying a claim upon another, except as provided in section 4 of this article.''

Section 6 of Art. 1 of the by-laws of the association is as follows:

''Certificates of membership in this association shall be issued and accepted by the members as quarterly term contracts between the association and the members, and shall take effect only on the day received by the member and on condition that he be then in good health and shall be renewable at the option of the members by payments in advance before expiration, and

shall continue only during the term for which payment has been made.    *    *    *''

Section 2 of Art. 3 of the by-laws of said association is as follows:

"Each assessment shall be levied *pro rata* on the guarantee deposit of each member, and shall be due and payable either in January, April, July or October, unless otherwise specified in the notice of assessment, and in addition to claims then unprovided for, may provide funds in advance for payment of claims to be anticipated in the ensuing three months, or any fraction thereof."

Section 1 of Art. 4 of the by-laws of said association is as follows:

"No personal liability, beyond the payment of the amount due on guarantee notes is incurred by becoming a member of this association. All other payments are at the option of the member, and shall continue only so long as he shall desire to keep his membership in force. In case of its termination by lapse or otherwise, he shall be liable for no further payment provided the notes given for the guarantee deposit shall have been paid."

Section 2 of Art. 4 of the by-laws of the association is as follows:

"Upon the failure of any member to pay any assessment or expense dues or note within the time and at the place required, his membership shall be thereby forfeited, and his right to any share or interest in the funds or property of the association shall cease absolutely at the expiration of the time stipulated in which such payments are required to be made, and all payments shall be forfeited to the association."

Section 5 of Art. 4 of the by-laws of the association is as follows:

"In the event that assessments are not paid promptly, the allowance to beneficiary of deceased members shall not thereby be impaired or lessened, but the sum of such arrears shall be taken from the reserve fund, and restored eventually by collection of arrearages or for-

feiture of the guarantee deposit as provided in section 2 of this article.''

Section 1 of Art. 6 of the by-laws of said association is as follows:

"Upon the death of any member while in good standing in the association, the guarantee deposit or pledge given by him to the association shall be returned to his beneficiary.''

At the time of making application for membership in appellee association, Fred Graves was twenty-eight years of age. He did not make a guarantee deposit in cash, but executed his note for twenty-eight dollars, pursuant to §2, Art. 10 of the articles of incorporation, which note is in the words following:

"Thorntown, Ind., April 27, 1908. For value received, I promise to pay to the Bankers Life Association, at Des Moines, Iowa, the sum of twenty-eight dollars, with semi annual interest at four per cent per annum, payable in April and October of each year. This note is payable in four equal installments, to become due as follows: One-fourth in October, 1909; one-fourth in April, 1910; one-fourth in October, 1910; and the other fourth in April, 1911, and payment at any depository of the association shall operate as a full release of the maker hereon. It is given for insurance, and as a pledge that I will maintain my membership in the association. It is not negotiable, and becomes void in the event of my death before maturity, but in case of lapse of membership, I agree that all unpaid installments shall at once become due. Depository No. ........
$28.00                              (Signed) Fred Graves.''

No part of this note was ever paid, as Fred Graves died on May 1, 1909, before the first instalment thereof matured. In December, 1908, appellee levied assessment call No. 103 on the members of the association for the benefit and expense funds, which assessment was due and payable during the month of January, 1909. The amount of Fred Graves' assessment was $2.80, for the benefit or mortuary fund and

$1.40 for the expense fund. The assessment was payable at the Home National Bank of Thorntown, Indiana, a duly authorized depository of appellee. Fred Graves did not, nor did any one for him at any time, pay the amount of said assessment, unless the deposit of the note for $28 by Graves, held by appellee, as a part of the guarantee fund, constituted such payment.

The single question presented to the court below was whether appellee, on the failure of Fred Graves to pay the mortuary and expense assessment during the month of January, 1909, should have paid the assessment out of his guarantee deposit instead of forfeiting his membership as was done. The finding and judgment of the trial court was in favor of appellee, and the error relied on for reversal in this court is the overruling of appellants' motion for a new trial.

1. It is manifest that the case turns on the construction to be given to the note itself, to the certificate, to the articles of incorporation and to the by-laws of the association. It is insisted by appellants that §3, Art. 10 of the articles of incorporation provides that mortuary assessments shall be levied *pro rata* upon the guarantee fund of the association; that the note given by the decedent in this case recites that it is given for insurance, and that §2, Art. 3 of the by-laws requires that each assessment shall be levied *pro rata* on the guarantee deposit of each member. We think the words used in the note, as well as in the sections indicated are not apt, and, considered independently, might give rise to serious doubt as to the meaning intended. But when the general plan of the association, as well as the articles of incorporation and the by-laws pertaining to the guarantee deposit are considered together, there can be no doubt as to the meaning of the various sections or the purpose of the guarantee deposit. It is expressly provided that it becomes a part or the guarantee fund, and that each fund shall be used only for the purpose indicated in the charter.

By §1, Art. 6 of the by-laws, it is provided that on the death of any member in good standing, the guarantee deposit or pledge given by him to the association, shall be returned to the beneficiary. If the articles and by-laws should be construed and held to permit the payment of mortuary assessments from the guarantee fund, which is wholly made up of the guarantee deposits of members in good standing, that fund might be exhausted, and without any provision for the reimbursement of the same by assessments levied against members, there could be no return of the guarantee deposits to beneficiaries. Without the guarantee fund, held as a pledge and as an inducement to members to continue in good standing, and transferred to the reserve fund on forfeiture of membership for nonpayment of assessments, the strength of the association would be speedily dissipated. As we see it, this guarantee fund is the distinguishing feature of appellee association—the feature which gives it permanence and stability.

The question presented by the record before us is not, however, one of first impression. The same question was considered by the Supreme Court of Minnesota, in the case of *Mee* v. *Bankers Life Assn.* (1897), 69 Minn. 210, 72 N. W. 74, wherein the court, speaking of the payment of an assessment of a member out of a guarantee deposit, said: ''The right was given to the association to appropriate the amount deposited in payment of death claims should the member so depositing default as to the assessments, but this provision was for the benefit of beneficiaries of those who did not default, not for the benefit of the depositing and defaulting member. Such a provision did not operate to keep alive and in force a lapsed certificate, or to continue a membership. If it could be given that effect, and it be held that membership continued so long as the amount deposited was not fully exhausted in meeting assessments, a premium would be offered to the members who declined to meet their assessments. The certificates became worth-

less when the membership ceased, and by the plain provision of the articles the membership ceased when annual dues or a mortuary call became due and were unpaid. From all of the articles, and taking into consideration the general plan of the association, we have no doubt as to the construction to be placed upon those portions of the articles relating to the deposit fund, and that a defaulting member has no interest therein.'' To the same effect is the case of *Hoover* v. *Bankers Life Assn.* (1912), 155 Iowa 322, 136 N. W 117.

Counsel for appellant press upon our attention the case of *Purdy* v. *Bankers Life Assn.* (1903), 101 Mo. App. 91, 74 S. W. 486. This was a case wherein the question presented related primarily to the right of the directors of appellee to forfeit the membership of Purdy on account of his intemperate habits. The court held that ''The articles of defendant contemplated no forfeiture of a certificate by the decision of the directors, for anything except defaulted payments, and if a member kept his assessments paid, he stood free from risk of losing his insurance save by the judgment of a judicial court.'' Following this clear statement, the court proceeded to hold that the guarantee fund could be used for the payment of assessments, saying ''Contrary to the assertion of defendant's counsel, the articles of incorporation state that the guarantee fund is to pay assessments: 'The guarantee fund shall consist of deposits pledged by each member of the association for the payment of assessments and the said deposit required of each member shall consist of the sum of one dollar for each year of age of the member at the date of the application.' '' It will be noted that the words now used in the articles defining the guarantee fund are that the fund ''shall consist of the deposits pledged by each member of the association for the prompt payment of assessments.'' But assuming that the change is not material, still we are unable to reconcile the apparent conflict in the court's holdings. Again in the same opinion, the court said: ''Defendant's counsel say

that the guarantee fund is not used for the payment of assessments, but only as the basis on which to compute their amount, citing *Mee* v. *Bankers Life Assn., supra.* That case is quite different from the one at bar; for it appears therein that mortuary benefits were provided for by the by-laws to be collected by assessments from the members, and that the so-called guarantee fund was simply a pledge for the payment of assessments. The forfeiture was upheld in that case, because the assured had failed to pay his assessment when called for in accordance with the by-laws.'' We think the court failed in its attempt to distinguish the case before it from the Mee case. It is apparent that the Purdy case is in direct conflict with the Mee case.

Five years later, appellee was again before the same court in the case of *McCoy* v. *Bankers Life Assn.* (1908), 134 Mo. App. 35, 114 S. W. 551, in which the question presented was the status of the association as an assessment company. The court said: ''The plan of the association is that each applicant at entry pays to the association a sum equal to one dollar for each year of his age, which is placed in what is called the guarantee fund. If he dies a member, the sum is paid to his beneficiary, in addition to the two thousand dollars mentioned in the certificate. If he fails to pay his expense dues or assessments within the time provided, the membership terminates, and this sum is forfeited to the association.'' Again in the case of *Smoot* v. *Bankers Life Assn.* (1909), 138 Mo. App. 438, 468, 120 S. W. 719, the same court said: ''The contract in terms provides that failure to pay at the time stipulated, subjects the membership and the contract to forfeiture. The proof shows, in fact, the plaintiff's own acts and letters admit failure to pay the assessment due in April within that month. The failure produces the forfeiture; it requires no act of the defendant to declare it. Forfeiture fell in by the failure to pay.'' A striking circumstance is that in neither

the McCoy case nor the Smoot case was any reference made by the court to the Purdy case.

In the case at bar, the trial court was clearly right in holding that Graves' membership was forfeited by his failure to pay the mortuary assessment levied in December, and payable during the month of January, 1909.

The judgment is affirmed.

NOTE.—Reported in 101 N. E. 638. As to features of the law specially applying to mutual life insurance, see 52 Am. St. 543. See, also, 29 Cyc. 177.