CARRIE J. BOND et al., *Appellants,* v. THE BANKERS
LIFE ASSOCIATION OF DES MOINES, IOWA, *Appellee.*

No. 18,160.

SYLLABUS BY THE COURT.

LIFE INSURANCE—*Default of Assessments—Guarantee Deposit—
Forfeiture.* The articles of incorporation of an association
doing business on the mutual assessment plan, together with
its by-laws and other writings which entered into the contract
of insurance between the member and association, examined,
and it is held that neither the guarantee deposit made by a
member when he is admitted to the association nor any part
of the guarantee fund of the association can be applied in
payment of delinquent assessments.

Appeal from Marion district court. Opinion filed
July 5, 1913. Affirmed.

*H. S. Martin,* of Marion, for the appellants.

*I. M. Earle,* of Des Moines, Iowa, for the appellee.

The opinion of the court was delivered by

JOHNSTON, C. J.: This was an action to recover on
a contract of insurance. The appellee is doing an
insurance business in Kansas and other states on the
mutual assessment plan. On November 1, 1898, it
issued a policy of insurance for the sum of $2000 on the
life of W. T. Bond, who paid a membership fee of $14.50
and gave a guarantee note promising to pay appellee
$29. In due time the note was paid by him. All assess-
ments or calls made upon him were paid except the one
which accrued on March 25, 1911, and this had not been
paid at the time of his death, which occurred on July 29,
1911. The failure to pay the last assessment operates
as a forfeiture of all rights under the policy unless the
amount paid by the insured on the guarantee note
should have been applied on the unpaid assessment.
The trial court decided that the amount contributed
by the insured towards the guarantee fund was not

available to pay the delinquent assessments and therefore gave judgment for the insurer. Appellants contend that the guarantee deposit of $29 belonged to the insured and was available under the insurance contract to pay defaulted assessments and keep the policy alive. They further contend that the language of the guarantee note conflicted with the terms of the policy and that the former should control, and, further, that where there is an inconsistency in the governing provisions of the contract they should be liberally interpreted in favor of the insured and as against a forfeiture. The appellee, on the other hand, insists that the provisions of the note, charter and by-laws, as well as the plan of insurance, all unite in showing that the guarantee deposit can not be used to pay the individual assessments of defaulting members. The application for insurance recited that it and the certificate of membership, together with the articles of incorporation and by-laws of the association, should form the insurance contract. In the guarantee note executed by the insured when he became a member there was added to the ordinary promise the words:

"It is given for insurance, is not negotiable, becomes void in the event of the death of the maker and all unpaid installments become at once due upon lapse of membership."

In the certificate of membership it was recited that:

"In the event of his death during membership his beneficiary shall receive the sum of two thousand dollars, and the guarantee fund deposited with the Association by the said member amounting to twenty-nine dollars."

It also contained the provision that:

"Upon the failure of the above-named member to make any payment due from him to the association at its maturity in January, April, July or October, of each year, his guarantee deposit and all other payments made shall be forfeited and his membership shall thereupon cease."

The following provisions of the charter and by-laws were presented to the trial court and are deemed to be pertinent to the determination of the question now submitted:

"ARTICLES OF INCORPORATION.

"ARTICLE 9.

"SECTION 2. The business of this association shall be conducted upon the mutual assessment plan, in which the payment of all assessments shall be secured by a guarantee fund, contributed by each member *pro rata* according to age at entry; this guarantee fund, together with the insurance provided in the certificate of membership and by-laws of the association, to be forfeited upon failure of a member to pay his assessments within the time prescribed by the by-laws of the association; provided, however, that relief from such forfeiture, and provision for reinstatement of lapsed members may be made by the board of directors.

"ARTICLE 10.

"SECTION 1. The funds of the association shall be kept separate and distinct upon the books thereof, and shall be designated as follows, to wit: The guarantee fund, the benefit fund, the reserve fund, and the contingent fund, and such other funds as the board of directors may hereafter establish.

"SECTION 2. The guarantee fund shall consist of the deposits pledged by each member of the association for the payment of assessments, and the said deposit required of each member shall consist of the sum of one dollar for each year of the age of the member at date of application counted at nearest birthday, and may consist of cash, or of note at four per cent interest, payable on such terms as the board of directors may prescribe, and the said board shall have power to declare a certificate of membership void and of no effect upon defalcation of payment of any note executed for said deposit.

"SECTION 4. The reserve fund shall consist of all guarantee deposits forfeited to the association by lapsed members, and the interest accruing from all funds of the association of whatever nature. This reserve fund shall be set apart as an emergency fund, for the purpose of providing for death losses in excess of one per cent per annum of the membership of the association, and for the further purpose of advances for the payment of death losses when the benefit fund is exhausted.

"SECTION 5. The contingent fund shall consist of all moneys collected for the purpose of defraying the expenses connected with the transaction of the business of the association.

"SECTION 6. Each fund shall be used expressly for the purpose indicated in the foregoing sections of this article respectively, and no appropriation shall be made of one fund for the purpose of paying a claim upon another, except as provided in section 4 of this article.

"ARTICLE 11.

"SECTION 1. In providing funds, either by established rates or by assessment, for the purpose of promptly meeting payment of all claims against the association, the board of directors may from time to time determine and fix the amount deemed necessary therefor, the place at which, and the time at which or during which it shall become due and payable, and the manner of notifying the members thereof, and may regulate the method of collecting the same; and the board may in like manner also provide funds in advance, for the payment of any claims which may be anticipated during the three months next ensuing, basing estimate therefor on the American Experience Table of Mortality."

"BY-LAWS.

"ARTICLE 1.

"SECTION 2. Applications for membership shall be accompanied by evidence of the health of the applicant, secured through medical examination, and the approval of an officer of, or employee occupying a position of trust in some banking institution. Each applicant shall deposit in cash or in notes made by him, a sum equal to one dollar for each year of his age for each certificate of $2000, for the guarantee fund, and one-half of that amount in cash for the first payment for the contingent fund, and shall pay ten per cent annually upon the amount of his guarantee deposit, for expense dues, payable one-half in January and one-half in July of each year.

"SECTION 3. Any number of certificates of membership, not exceeding three, may by provision to be made by the board, be issued to one member, and each certificate shall entitle the heirs, or legal representative, or designated beneficiary of a deceased member, to $2000 benefit, to be provided for by assessment on the membership levied *pro rata* upon the guarantee fund of the association, unless otherwise supplied, and in the event that such assessments are not sufficient to meet all claims promptly, the board of directors may levy and collect by assessment on the members such additional sums as may be necessary.

"SECTION 6. Certificates of membership in this association shall be issued and accepted by the members as quarterly term contracts between the association and the members, and shall take effect upon delivery and shall be renewable at the option of the members by payments in advance before expiration, and shall continue only during the term for which payment has been made.

"ARTICLE 3.

"SECTION 2. Each assessment shall be levied *pro rata* on the guarantee deposit of each member, and shall be due and payable either in January, April, July or October, unless otherwise specified in the notice of assessment, and in addition to claims then unprovided for, may provide funds in advance for payment of claims to be anticipated in the ensuing three months, or any fraction thereof.

"ARTICLE 4.

"SECTION 1. No personal liability, beyond the payment of the amount due on the guarantee notes, is incurred by becoming

Bond v. Bankers Life Ass'n.

a member of this association. All other payments are at the option of the member and shall continue only so long as he shall desire to keep his membership in force. In case of its termination by lapse or otherwise he shall be liable for no further payment, provided the notes given for the guarantee deposit shall have been paid.

"SECTION 2. Upon the failure of any member to pay any assessment or note within the time and at the place named therein, his membership shall be thereby forfeited, and his right to any share or interest in the funds or property of the association shall cease absolutely at the expiration of the time stipulated in which such payments are required to be made, and all payments made shall be forfeited to the association.

"SECTION 4. In the event of the forfeiture of the rights and privileges of a member of this association the guarantee deposit pledged by such members shall become forfeited absolutely and become the property of the association.

"SECTION 5. In the event that assessments are not paid promptly the allowance to beneficiary of deceased members shall not thereby be impaired or lessened, but the sum of such arrears shall be taken from the reserve fund, and restored eventually by collection of arrearages or forfeiture of the guarantee deposit as provided in section 2 of this article.

"ARTICLE 6.

"SECTION 1. Upon the death of any member while in good standing in the association, the guarantee deposit or pledge given by him to the association shall be returned to his beneficiary."

Under this scheme of mutual insurance can members default in the payment of assessments without forfeiture of their membership rights? If members are unable or unwilling to pay assessments, have they a right to expect and insist that money shall be taken from the guarantee fund to meet their defaults and keep their certificates alive? The unpaid assessment in this instance was only $3.36, and the court hesitates to enforce a forfeiture of membership if, upon any reasonable theory, it can be held that the association has other moneys of the insured which could have been applied to pay the assessment. So it has been said that the court:

"In construing the conditions of membership when a forfeiture is claimed, will preserve, if possible, the equitable rights of the holder of the certificate of membership." (*Modern Woodmen v. Jameson*, 48 Kan. 718, syl. ¶ 1, 30 Pac. 460.)

In another case of a similar kind it was said:

"No freedom of interpretation, however, should be indulged to accomplish the forfeiture of property rights." (*United Workmen v. Haddock,* 72 Kan. 35, 39, 82 Pac. 583, 1 L. R. A., n. s., 1064.)

Interpreting the provisions of the certificate, charter and by-laws as liberally in favor of membership rights as is permissible under any rule we are unable to sustain the contention of appellants. Apart from the provision in the guarantee note that it was given for insurance nothing is found which indicates that a member can postpone payment of assessments with the assurance that the guarantee fund will be used to relieve him from the effect of his default. As will be observed from the quoted provisions of the contract, the association has four funds, the guarantee, benefit, contingent, and reserve, and each belongs to the organization and is subject to its control. No member has any separate ownership or control of any part of these funds. The guarantee fund is, in a sense, a trust fund to be devoted to specified uses and can not be diverted to any other use. It is made up of the sums which each member contributes as a pledge that he will pay his assessments when due, and the alternative provisions are that if he does not pay these the deposit shall be forfeited and become a part of the reserve fund. There is no provision that any part of it can be paid to or used by the member in any event. It is provided that if a member has paid all his assessments and dies in good standing the amount of the original deposit shall be paid to his beneficiary. The deposits which are forfeited and pass into the reserve fund are applied to the payment of death losses in excess of one per cent per annum of the membership, and in case there is not sufficient money in the benefit fund at any time to meet current death losses resort may be had to the reserve fund containing the forfeited deposits to pay such losses, and the amount so temporarily withdrawn is to

Bond v. Bankers Life Ass'n.

be restored to the reserve. fund when the benefit fund has been replenished from assessments. On account of this provision members are assured that losses will be paid even if a part of the members shall delay payment of assessments for a time or should absolutely forfeit their membership. The provision that the guarantee deposit shall go into the reserve fund for the payment of certain losses is wholly inconsistent with the theory that it can be used to pay assessments, and the provision that the amount of the deposit shall be paid to the beneficiary of one who was a member at his death is inconsistent with the theory that they may be devoted to the payment of the assessments of members, and so counsel pertinently ask, How can the guarantee deposit be used to pay the member's assessment when the certificate requires it to be paid in full to the beneficiary in case the member dies in good standing? It is likewise true as to the interest that may have been received on deposit obligations. It, too, goes into the reserve fund, which is to be applied to specified uses, and it is clear that if it must be used for the specified purposes it is not available to pay assessments against members. The express provision that the guarantee deposit shall be forfeited for nonpayment of assessments is irreconcilable with the theory that it can be used to pay assessments. The purposes of the guarantee deposit, including the assurance thereby given to paying members that losses will be paid although some of the members should become delinquent in the payment of assessments, would be frustrated if the guarantee fund should be depleted by paying the assessments of delinquent members. The charter provisions, as well as those in the by-laws, are not open to a construction that would permit this to be done. It is ingeniously argued by counsel for appellants that as the guarantee note given by the insured designates the deposit as insurance it necessarily led the insured to believe and warrants the court in holding that the de-

posit which he contributed was intended to be used for the insurance of himself, and that in case of necessity the money could be applied for his individual protection and to prevent a forfeiture of his certificate. If the theory could be maintained that the deposit belonged to him and was for his individual protection, there would be reason in appellants' contention that there is a conflict between this and the other provisions of the contract, and at the oral argument the writer was inclined to the view that a conflict did exist between the provisions of the note and those in the other provisions of the contract. A closer examination of all the provisions, however, satisfactorily shows that there is no real conflict in them. The ·deposit given is for insurance, it is true, but it is for the insurance of members in good standing and not of those in default who have forfeited membership in the· association. It is association instead of individual insurance, and is not subject to individual control or use. In a case against the appellee involving the identical question presented here the supreme court of Iowa decided that the assessments of members could not be paid from the guarantee fund. After setting out the pertinent provisions of the articles of incorporation and by-laws it was said:

"Under the provisions quoted, the guaranty deposit can only be used in one of the two ways specified. If the member dies in good standing, it is paid to his beneficiary—the whole of it, not a part thereof; if he fails to pay his assessments, it is forfeited to the reserve or emergency fund. In no case can the member have the guaranty deposit used for the payment of his dues or assessments, or have it used in any other way for his benefit." (*Hoover v. Bankers Life Ass'n* [Iowa, 1912], 136 N. W. 117, 119.)

Another case against appellee arose in Indiana on a like contract and where it was contended that the language in the note as to insurance made the deposit available for the payment of assessments, and the court

ruled that the words of the note taken alone might give rise to doubt, but when the plan of the association, as shown by the articles of incorporation and by-laws, was considered there could be no doubt upon the proposition, and it was remarked:

"If the articles and by-laws should be construed and held to permit the payment of mortuary assessments from the guaranty fund, which is wholly made up of the guarantee deposits of members in good standing, that fund might be exhausted, and without any provision for the reimbursement of the same by assessments levied against members, there could be no return of the guaranty to beneficiaries. Without the guaranty fund, held as a pledge and as an inducement to members to continue in good standing, and transferred to the reserve fund on forfeiture of membership for nonpayment of assessments, the strength of the association would be speedily dissipated. As we see it, this guaranty fund is the distinguishing feature of appellee association—the feature which gives it permanence and stability." (*Stubbs v. Bankers Life Ass'n*, [Ind. 1913], 101 N. E. 638, 640.)

The same view of appellee's plan of insurance was taken in *McCoy v. Bankers Life Assn.,* 134 Mo. App. 35, 114 S. W. 551. The St. Louis court of appeals, however, took a different view of appellee's scheme of insurance and the use to which the guarantee fund might be applied. That court held that the application and the certificate constituted the contract and that the by-laws were no part of it. Some attention, however, was given to the articles and the by-laws of the association and an interpretation contrary to that which we have placed upon them was given. (*Purdy v. Bankers Life Ass'n,* 101 Mo. App. 91, 74 S. W. 486.) In a later case the same court had before it the same articles and by-laws, and after examining them held that a forfeiture had occurred by the nonpayment of assessments and proceeded as if the guarantee fund was not available to meet such assessments. The earlier case was ignored and evidently disapproved. (*Smoot v.*

*Bankers Life Assn.*, 138 Mo. App. 438, 120 S. W. 719.)

In a case from Minnesota, depending on similar facts and wherein a question arose as to the payment of an assessment out of the guarantee deposit, it was said:

"The right was given to the association to appropriate the amount deposited in payment of death claims should the member so depositing default as to the assessments, but this provision was for the benefit of the beneficiaries of those who did not default, not for the benefit of the depositing and defaulting member. Such a provision did not operate to keep alive and in force a lapsed certificate, or to continue a membership. If it could be given that effect, and it be held that membership continued so long as the amount deposited was not fully exhausted in meeting assessments, a premium would be offered to the members who declined to meet their assessments. The certificates became worthless when the membership ceased, and by the plain provision of the articles the membership ceased when annual dues or a mortuary call became due and were unpaid." (*Mee v. Bankers Life Association*, 69 Minn. 210, 214, 72 N. W. 74.)

The judgment of the district court will be affirmed.

PORTER, J., not sitting.