Co. v. Texas Rice Land Co., Tex.Civ.App., 253 S.W. 916, affirmed, Tex.Com.App., 265 S.W. 888.

With these rules in view, we examine the pleading above copied to determine whether it alleges fraudulent concealment by Owen. The allegations with reference to the devices employed to conceal the fact that Jenkins was negotiating the purchase for the benefit of Owen do not go to the question of the concealment of any cause of action which King had against Owen for he had none until the sale was consummated. No legal fraud was involved in those transactions. Contracts made by an agent in his own name without disclosing that he has a principal in the transaction are not illegal; the undisclosed principal may sue thereon. In the instant case King was not injured because of the fact that Owen was Jenkins' undisclosed principal. He dealt with Jenkins and procured every right for which he contracted. Concealment of the fact of agency is not a legal wrong, and to hold that such concealment would toll the statute of limitation would be to hold that the statute is not available to an undisclosed principal. Such a holding would open wide the gates for fraud and could be justified by no rule of law with which we are familiar. This question was before the Supreme Court of Utah in the case of Gibson v. Jensen, 48 Utah, 244, 158 P. 426, 428, and was disposed of in this language: "The law is well settled, where there is no fraudulent conduct on the part of the principal, the mere fact that he is unknown does not toll the statute. The general rule is that, if a cause of action is barred against the agent of an undisclosed principal, it is also barred against such principal unless there was fraudulent concealment of the principal. Mere concealment of the agency, if such be done, is not such fraud as will toll the statute. Ware v. Galveston City, etc., 111 U.S. 170, 4 S.Ct. 337, 28 L.Ed. 393; St. Paul Title & Trust Co. v. Stensgaard, 162 Cal. 178, 121 P. 731, 39 L.R.A.(N.S.) 741; 25 Cyc. 1221."

The cited case of Ware v. Galveston City, etc., supra, is in point and supports the holding of the Utah court. The other authorities cited seem not to be directly in point.

The petition alleges no fraudulent act of concealment of the cause of action after it came into existence. There is an allegation that Jenkins thereafter made and executed a bill of sale to Owen in order to avoid any suspicion on King's part, but it is not alleged that King ever knew of such bill of sale or that he was mislead thereby. On the contrary, in another portion of his pleading he alleges that the bill of sale was not filed for record. No allegations of such fraudulent concealment of the cause of action as will toll the statute of limitation are contained in this petition. The special exception should therefore have been sustained.

The judgments of the trial court and the Court of Civil Appeals are both reversed and the cause remanded.

Opinion adopted by the Supreme Court.

## ORDER OF RAILWAY CONDUCTORS OF AMERICA v. QUIGLEY.

### No. 2108—6964.

Commission of Appeals of Texas, Section A. Jan. 5, 1938.

Grimm, Elliott, Shuttleworth & Ingersoll, of Cedar Rapids, Iowa, and Arnold & Arnold and Wm. Hodges, all of Texarkana, for plaintiff in error.

N. L. Dalby and King, Mahaffey, Wheeler & Bryson, all of Texarkana, for defendant in error.

GERMAN, Commissioner.

Prior to May 17, 1932, C. M. Quigley had been a member of the Order of Railway Conductors of America for many years. He carried a policy of insurance provided by the Order for its members, which, prior to August 1, 1931, was carried upon the mutual assessment plan. On August 1, 1931, the Order, in compliance with statutes, changed its plan of insurance so that thereafter it should be carried on the legal reserve plan, based upon premiums payable monthly, quarterly, semiannually, or annually, as the member might elect. This change in plans resulted in the cancellation of the insurance of all members as of date August 1, 1931, but privilege of accepting insurance under the new plan was timely extended to all members, and with members such as was Quigley the privilege could be exercised at any time prior to December 31, 1931, without medical examination. Quigley had first declined to take any insurance under the new plan. However, about October 21, 1931, he wrote a letter to the general office of the Order at Cedar Rapids, Iowa, indicating his desire to take insurance in the sum of $2,000 under the new plan. In this letter he inclosed money order for $10.37 to pay the premium for August, 1931, and stated, "I will take care of September dues this month." Proof was made that the Order usually made reply to such communications promptly upon receipt of same by card addressed to the applicant reading in substance as follows: "Your letter has been received and your case will be taken care of as soon as possible. I trust you will be patient and remember that this office has a tremendous amount of work to do. Remember your monthly rate is $———— and must be paid during each current month." Whether in this particular instance such card was sent to Quigley is not shown. However, on November 5, 1931, the Order did send a communication to Quigley in substance as follows: "New Certificate 23240 is being issued to you, and the monthly rate on same is $10.37. It will be mailed to you in the near future. Should you communicate with this office, or make remittance, in the meantime please mention the number of your certificate, in order that we may make proper identification."

It appears to be undisputed that prior to August 1, 1931, and for several months thereafter, on account of the change in the plan of insurance, the cancellation of old policies and the issuance of new ones, and the vast amount of correspondence resulting therefrom, the office force of the Order was wholly unable to promptly transact the business of the Order. Due to this vast accumulation of work the Order employed from 20 to 30 extra helpers, and would have employed more, if competent workers could have been obtained. This condition resulted in great delay in the issuance and forwarding of new policies.

It is undisputed that after the remittance of $10.37 for the August premium Quigley never made any other remittance to the Order and never paid any sum as premiums. However, sometime in February, 1932, the Order mailed a policy to Quigley in the sum of $2,000, effective as of date August 1, 1931, showing upon its face the amount of annual, semiannual, quarterly, and monthly premiums. It is not shown when the policy was mailed to Quigley, but the receipt signed by him was received by the Order in Cedar Rapids February 15, 1932. The policy, however, must have

been received by Quigley on or about February 12, 1932, for on that date Mrs. Quigley wrote the Order at Cedar Rapids as follows: "In regard to a policy of Charlie Martin Quigley was 363. And since they raised the due they gave him a new number which is 23240, that he could pay semi-ann'l $60.56, quarterly 30.85, month 10.37. You men know that Mr. Quigley was in good standing up to the time he was taken sick; has been a O. R. C. member for 27 years. He wants to keep up his due, but owing to his sickness he cannot. I made it known at the Lodge at Bonham, Tex., that they would have to look after this ins. until Mr. Quigley gets where he can. And as I have not heard from them, I am going to ask you O. R. C. to take care of Mr. Quigley's dues until he gets where he can and just as soon as he gets able to go back to work I will let you know, then he will look after them himself. After he has carried this Policy for 27 years, I don't feel that he should lose it. Now please see to this at once and let me know. Trusting to here from you at an early date so I will know what to look to. I told the Lodge at Bonham they would have to see to this for me, and since I have no reply will ask you gentlemen to please take care of Mr. Quigley due. And just as soon as he get where he can take care of them will let you know. Thanks."

On February 17, 1932, the Order replied to this communication direct to Quigley, saying:

"I am in receipt of a letter under date of February 12th signed by Mrs. Quigley in which she states that your physical and financial condition had been made known to Secretary of Division 363.

"I have called for your file, and I find that you are holding policy No. 23240, which is a $2000 Ordinary Life issued in lieu of your old Certificate B—13840—Age 62, the monthly rate thereon being $10.37. Inasmuch as only one month's dues were paid on this policy, it lapsed for non-payment of assessments, and if you desire to carry insurance in the Order of Railway Conductors, it will be necessary that you pass a medical examination, same to be approved by the medical directors before a new certificate can be issued. It would then be issued at the rate chargeable at your attained age at the time of making new application.

"It is unfortunate that the Grand Division could not consistently revise rates in accordance with each member's ability to pay, but under the Legal Reserve Plan of Insurance, the rate charged each member is sufficient to cover the death rate in his class as well as create his own individual reserve."

On February 23, 1932, Mrs. Quigley made reply to the foregoing letter. It is not necessary to set out this reply in full, but a pertinent statement therein is as follows: "When they changed the dues I paid the first due after it was changed to $10.37, then I made it known to the O. R. C. lodge at Bonham for them to please keep up Mr. Quigley due until he got well, and then he would see to them his self."

On February 25, 1932, the Order replied to this letter of Mrs. Quigley, and among other things said: "It is unfortunate, and I am indeed sorry, that the condition exists as it does. We have no record in this office of any communication from you so I presume you wrote directly to the Secretary of Division 363 at Bonham, Texas. However, the fact remains that in the insurance world a rate is charged that pays the death rate for a given age, as well as creates the member's individual reserve, and the necessary fee must be placed in that fund each month to meet all obligations. Inasmuch as there was no premium paid on Mr. Quigley's certificate after the month of August, the certificate lapsed."

It is undisputed that after this date Quigley paid nothing in the way of premiums, and did nothing to indicate an intention of paying same. Some steps were taken looking toward participation by him in the relief fund maintained by the Order, but it is undisputed that no formal application was made and no formal action was ever taken by the Relief Fund Board. This will be referred to later.

This suit was instituted by Mrs. Lillian Quigley, wife of the said C. M. Quigley, and the beneficiary named in the policy of date August 1, 1931. She sought to recover the full amount of said policy. Although it was found by the trial court, and is not questioned, that the policy was effective as of date August 1, 1931, and on the date of its delivery in February, 1932, the monthly premiums for September, October, November, December, January, and February were unpaid, yet it is con-

tended that by the delivery of said policy the Order waived the forfeiture due to nonpayment of the premiums. The policy in question provided that all premiums were payable in advance, and it was further provided that, "if any premium is not paid when due as provided, this certificate shall automatically and without notice become void; except as otherwise herein provided." The provisions otherwise provided related to options which would exist after the payment of premiums for three full years. It is undisputed that the provisions in the policy for forfeiture for failure to pay premiums were in accordance with the bylaws and constitutions of the Order, which were expressly made a part of the certificate.

Mrs. Quigley, defendant in error here, will be referred to as plaintiff. Plaintiff in error, the Order of Railway Conductors of America, will be referred to as defendant, or the Order.

The trial court held that the mere fact of delivery of the policy in February, 1932, had the effect of constituting a waiver of the forfeiture previously brought about by the nonpayment of premiums from September to February, inclusive, and rendered judgment in favor of plaintiff for the full amount of the policy. The Court of Civil Appeals affirmed this holding. 83 S.W.2d 701.

■ There are numberless cases in the books dealing with the question of waiver of forfeiture of insurance policies resulting from nonpayment of premiums. In many of such cases the broad statement is made that an insurance company may waive the payment of premiums after they have become due and payable, even when the certificate provides that failure to pay same shall automatically work a forfeiture of the policy. This of course is not an accurate statement of the law. After a very extensive investigation we have been unable to find any case where an insurance company (in the absence of facts creating an estoppel) has been held to have waived the payment of premiums entirely; that is, to have actually remitted same, or discharged the insured from the payment of same. If an insurance company attempted to do such a thing, it would undoubtedly constitute an unlawful discrimination under article 5053 of the Revised Statutes of 1925, as amended by Acts 1929, 1st Called Sess., c. 3, § 1, Vernon's Ann.Civ.St. art. 5053, and the

company would be subject to the penalties therein provided. We are not called upon to decide whether or not an insurance company may waive payment of premiums entirely, and the policy remain valid. Such practice would apparently be wholly inconsistent with the laws underlying the creation of legal reserves by insurance companies. See Smathers v. Bankers' Life Ins. Co., 151 N.C. 98, 65 S.E. 746, 18 Ann.Cas. 756; Coughlin v. Reliance Life Ins. Co., 161 Minn. 446, 201 N.W. 920. The decisions, as indicated above, have not gone to that extent. What has usually been decided is that the prompt payment of premiums may be waived; or, to be more accurate, that the forfeiture of the policy by reason of nonpayment of premiums may be waived, not by a remittitur of the premiums, but by acts or conduct indicating an intention not to enforce the forfeiture, under an understanding or expectation that the premiums will be later paid, existing pending negotiations looking to payment or satisfactory arrangements for the payment. The leading case by our Supreme Court is that of Equitable Life Assurance Society v. Ellis, 105 Tex. 526, 147 S.W. 1152, 152 S.W. 625, relied upon by the Court of Civil Appeals. It will be observed, however, that the court in that case went no further than to hold that the assurance society, by reason of conduct, "consisting of correspondence and negotiations ending in an offer to keep the insurance in force by means of a loan on the value of the policy," indicated an intention not to enforce the forfeiture, but to treat the policy as valid; and such evidence was sufficient to support submission of an issue of waiver to the jury.

■ It is held in many cases that payment of the first premium in advance and before delivery of the policy may be waived, on the theory, however, that the delivery raises a presumption that the insurance company has extended credit to the insured for such premium. Under the circumstances of this case, we think it appears with reasonable certainty that the mailing of the policy to Quigley when premiums were past due was the result of a mistake, due to conditions in the general office, and there was no intention whatever of waiving the prompt payment of the premiums. Gardner v. Inter-Ocean Life & Casualty Co., 93 Kan. 810, 145 P. 844. However, giving to the insured the bene-

fit of every doubt in this respect, we are of the opinion that the very most that can be said is that when the Order delivered the policy there was a presumption of an extension of credit; but with the expectation and intention that Quigley would make prompt settlement on receipt of the policy of all premiums according to the terms contained in the face of the certificate. But assuming that there was an extension of credit so far as these premiums were concerned, and that Quigley was to have a reasonable time within which to pay same, the extension of credit was terminated when, after advice that Quigley was wholly unable to pay the premiums and was looking to someone else to do so, the Order on February 17, 1932, and again on February 25, 1932, advised that certificate was forfeited, which was a clear declaration that the Order was no longer willing to forego payment of the premium. Thereafter Quigley made no effort to pay these premiums or those becoming due March 1st, April 1st, and May 1st.

We therefore conclude that prior to the date of the death of Quigley the policy had lapsed for nonpayment of premiums and was not an enforceable obligation. The following cases in principle are in point: Thompson v. Knickerbocker Life Ins. Co., 104 U.S. 252, 26 L.Ed. 765; Ginners' Mutual Ass'n v. Fisher, Tex.Com.App., 238 S.W. 207; Donnelly v. Northwestern Life Ins. Co., 5 Cir., 59 F.2d 46; Southland Life Ins. Co. v. Hopkins, Tex.Com.App., 244 S.W. 989.

■ The defendant Order, in addition to its insurance department, had provisions for the maintenance of a relief fund. This fund was raised by assessments upon all of the members of the Order, whether carrying insurance or not. The purpose of the fund was to provide help and benefit for needful or disabled members, their wives, and minor dependents. This relief fund was to be disbursed under directions of the Relief Fund Board in such sums and in such manner as that board might determine. Such fund did not become payable until application therefor had been made in accordance with rules of the board, and until the board made proper order thereon. It was further provided that before granting relief the board might require the giving of security for repayment of any sum paid for relief. This relief fund was kept separate from all other funds of the Order. As stated above, no formal application, according to the rules of the Relief Fund Board, had ever been filed with that board on behalf of Quigley, and no allowance from the fund had ever been made to him. Some of the officers of the local lodge at Bonham testified that Quigley for some time, and even after February, 1932, declined to make formal application for relief, because such action would prejudice his right to seniority in service with the railway company. While it is very clear that the condition of Quigley was such as to entitle him, upon proper application and proof, to participate in the relief fund, yet there is nothing whatever to show he had any fixed or definite interest in such fund that was presently payable.

It is contended by plaintiff that on account of the contingent interest which her husband had in the relief fund, the Order should have made application from that fund to payment of premiums on the insurance policy in order to prevent a forfeiture. With this we cannot agree. It has been decided in some cases that an insurance company which has in its possession funds absolutely due and payable to the insured before the date upon which his premiums become due, which funds have not been set aside for some other purpose, should make application of such funds to payment of premiums in order to prevent a forfeiture. Timmerman v. Bankers' Reserve Life Co., 122 Tex. 603, 605, 63 S.W.2d 687. This rule cannot have application here for two reasons: First, because until proper application and proof, and allowance by the Relief Fund Board, there was nothing due Quigley from the relief fund to be applied to his premiums; even if otherwise applicable. Guaranty Old Line Ins. Co. v. Winstead, Tex.Civ.App., 91 S.W.2d 1164; Martin v. Illinois Bankers Life Assurance Co., Mo.App., 91 S.W.2d 646, and authorities there cited. Second, because this relief fund was a trust fund, dedicated to an entirely different purpose, and could not be applied by the Order to payment of premiums. Bond v. Bankers' Life Ass'n, 90 Kan. 215, 133 P. 854.

The judgments of the Court of Civil Appeals and of the trial court are reversed and judgment here rendered in favor of plaintiff in error.

Opinion adopted by the Supreme Court.