ELLA V. MEE v. BANKERS' LIFE ASSOCIATION OF MINNESOTA.[1]

July 9, 1897.

Nos. 10,509—(167).

**Life Insurance—Assessments—Time of Making.**
> The articles of defendant, a life insurance association upon the assessment or co-operative plan, provided that all assessments for death losses should be made by resolution of the board of trustees, and a by-law had been adopted which read "until and unless otherwise ordered by the board of trustees," mortuary assessments shall be made only on the first secular days of April, July, and December in each year, and by special resolution.  On November 6, 1893, the board, by resolution, made and levied the regular December assessment for death losses which had actually occurred, and from that time on until the last day of November the secretary and his clerks were actually engaged in preparing, causing to be printed, and in preparing for the mailing of necessary notices of assessments for over 12,000 members of the association.  These notices bore date December 1, and were mailed to members November 30.  *Held*, that the articles and by-laws were substantially complied with, and that the December assessment was regularly and properly made.

**Same—Default in Payment—Deposit in Guaranty Fund.**
> On being admitted, each member was required to deposit with the association as many dollars for each certificate of $2,000 as he was years of age, in pledge to secure the payment of all assessments against him,

[1] Reported in 72 N. W. 74.

occasioned by death of members. *Held*, taking into consideration the general plan of the association and the articles relating to this deposit, that a member who had defaulted in the payment of his assessments was not entitled to have his "guaranty deposit" applied in payment of such assessment.

## Same—Forfeiture of Membership—Waiver.

If in negotiations or transactions with a member after knowledge of a ground of forfeiture of his membership such an association recognizes the continued validity of the certificate, or does acts based thereon, the forfeiture is, as a matter of law, waived, and such a waiver need not be based on any new agreement or on estoppel. The forfeiture may be waived although the maker was in ill health at the time, and could not have furnished evidence required by the association as to his continued good health.

## Same—Secret Intent of Association.

A secret intention on the part of the association not to waive a forfeiture cannot defeat the legal effect of unequivocal and deliberate acts of its officers.

## Same—Evidence of Waiver.

*Held*, taking into consideration all of the circumstances appearing on the trial, that there was evidence which would have warranted a finding that defendant association, by its conduct subsequent to knowledge of a forfeiture, had waived the same, and had concluded to treat its contract as still in force.

Appeal by plaintiff, as administratrix of Harry Mee, from an order of the district court for St. Louis county, Moer, J., denying plaintiff's motion for a new trial after the direction of a verdict for defendant. Reversed.

*Billson, Congdon & Dickinson*, for appellant.

*McDonald & Fauntleroy*, for respondent.

COLLINS, J.

This was an action upon two certificates of membership in defendant life insurance association upon the assessment or co-operative plan, issued simultaneously in April, 1892, to one Edward W. Mee; the beneficiary therein named being a brother, Harry Mee. The former died April 2, 1894, and the latter died intestate soon after the institution of this action, whereupon the administratrix of his estate was substituted as plaintiff. At the trial the court below ordered a verdict in favor of defendant, and on appeal from an order

denying plaintiff's motion for a new trial the principal assignments of error relate to the ruling on which the verdict was based.

The defense relied upon by the association was that by reason of a neglect to pay a mortuary assessment or call made December 1, 1893, and which, according to the articles of association, had to be paid within 30 days thereafter, Edward W. Mee ceased to be a member of said association, and said certificates became null and void long prior to his decease, it being provided in said articles that default in payment should operate to terminate a membership without any further act or ceremony whatsoever. A full history of various matters which occurred in relation to and subsequent to this December assessment, and also in relation to an assessment made on April 1 following, was set forth in the answer, but the plaintiff made these matters and circumstances a part of her case in chief. So that, when the instruction we have mentioned was given to the jury, all of the facts fully appeared; those upon which the association rested its defense as well as those upon which plaintiff relied. It was conceded that the amount due upon the December mortuary call was not paid when due, and as to what transpired in reference to it we shall have occasion to allude further on, as well as to other facts.

1. The first point made by plaintiff's counsel is that the so-called December assessment was invalid for two distinct reasons: (a) Because all steps looking toward the assessment were taken prior to a time specifically prescribed by the by-laws; (b) because no complete assessment was made by the board of trustees or by its resolution, what was relied on being largely the acts of the secretary or of some clerk under his direction.

We do not think it worth while to discuss this point at length. It stood admitted that ten death losses had actually occurred when on November 6, 1893, an assessment being necessary and obligatory upon the association, the board of trustees, by resolution, made and levied the regular December assessment upon all members, to be collected according to the articles of the association. From that time on until the last day of November the secretary and one or more clerks were engaged in preparing, causing to be printed, and in getting ready for mailing the necessary notices of assessment or mortuary calls for over 12,000 members. These notices were dated

December 1, and mailed on the last day of November. The articles provided that all assessments for the payment of death losses should be made by resolution of the board of trustees, and a by-law had been adopted, which read "until and unless otherwise ordered by the board of trustees, mortuary assessments" shall be made only on the first secular days of April, July, and December in each year, and by special resolution. Although the resolution in question was adopted November 6, it was expressly made for the December assessment. It was necessary for the resolution to be made and adopted prior to the first secular day in December, long enough before, at least, to prepare the notices for mailing, and this is what was done. That the secretary and his clerks performed a large amount of clerical work incident upon the adoption of the resolution is of no consequence whatsoever. The articles and the by-laws were substantially complied with, and the assessment regularly and properly made.

2. It is contended that, although the member failed to pay the amount of the December assessment within the specified time, and was in default, that the association had in its possession funds belonging to him exceeding the amount required, and which, by the terms of the articles of association as they stood when he became a member, were held in pledge for the purpose of meeting assessments, and for this reason the association could not treat the contract as forfeited, for there was no forfeiture. After the certificates were issued, and prior to the December assessment, the articles were amended, so that as to all members subsequently joining the above claim could not be made; but the claim is that, as to members who had previously joined, these amendments did not apply. It is immaterial whether they did or did not.

Article 4 of the original articles provided that each member, upon being admitted, should deposit with and to the credit of the association as many dollars as he was years of age—counting to his nearest birthday—in pledge to secure payment of all assessments, occasioned by death of members, made against him during his life, and to be known as the "guaranty deposit." Time might be granted to make this deposit, and it was granted in this case by the execution and delivery of a note for each membership,—one for $45, due in

one year; the other, for the same amount, due in two years. The first matured April 4, 1893, and was paid. The second matured April 4, 1894, two days after the maker died. The claim we have mentioned is based on the payment of the first note.

By article 7 it was provided that a member should continue and be a member only so long as he should pay all annual dues and mortuary assessments, and in case of default all moneys by him paid or pledged "will nevertheless be used and applied to the purposes for which the same were so paid and deposited." A part of article 10 was as follows:

"All amounts pledged to this company to secure payment of assessments occasioned by death of its members shall be used only for that purpose, and meanwhile the same shall be and remain invested in United States registered bonds, and shall constitute and be known as the 'Guaranty Trust Fund'."

And a part of article 11 was in the following words:

"All losses occasioned by death of members shall be collected by this company from its members, and, in case of default on the part of any member, the amount of his assessment on account of such loss shall be paid out of his guaranty deposit."

There were no provisions in the articles for a subsequent payment by a member of any assessment on which he was in default, and which had been made good out of the money pledged, so that, if the claim of counsel was sustained, any member might default in payments with impunity so long as the amount pledged covered the total of the assessments made against him. Not only would he remain a member, but the amount of his deposit would be absorbed in meeting assessments without any provision for making it good at any time, either while the depositor remained a member or at his decease, through a deduction from the sum to be paid to the beneficiary named in the certificate, although it was provided that the amount due on a guaranty deposit should be deducted from the sum paid in all cases where the member died without having paid in full.

We cannot construe these articles as counsel insists. The right was given to the association to appropriate the amount deposited in payment of death claims should the member so depositing default as to the assessments, but this provision was for the benefit of

the beneficiaries of those who did not default, not for the benefit of the depositing and defaulting member. Such a provision did not operate to keep alive and in force a lapsed certificate, or to continue a membership. If it could be given that effect, and it be held that membership continued so long as the amount deposited was not fully exhausted in meeting assessments, a premium would be offered to the members who declined to meet their assessments. The certificates became worthless when the membership ceased, and by the plain provision of the articles the membership ceased when annual dues or a mortuary call became due and were unpaid. From all of the articles, and taking into consideration the general plan of the association, we have no doubt as to the construction to be placed upon those portions of the articles relating to the deposit fund, and that a defaulting member has no interest therein.

3. But it is argued, even if the December assessment was valid, and a forfeiture actually took place, that the forfeiture was subsequently waived by the acts of the officers of the association. This claim makes it necessary for us to refer to some of the facts as they appeared in evidence.

It was shown that a short time prior to December 1, 1893, Edward W. Mee went from his home in Duluth to a remote and sparsely settled portion of this state on business, that he was there taken sick, that he did not return to his home until late in December, and was then sick. His sickness continued until his decease, April 2, as before stated. On February 6, 1894, after Mee's delinquency had continued more than one month, the secretary of the association wrote to him, calling attention to the fact, and advising him that if he desired to keep his insurance in force it would be necessary for him to remit the amount of the assessments, $18, together with a health certificate, properly signed. A blank certificate was inclosed, and Mee was informed that upon receipt of the amount due, and the approval of the duly-executed certificate by the proper officers, he would be readmitted as a member. Immediately on receipt of this letter, Mee replied, inclosing his brother's check for the amount due, but omitting to send the certificate. Under date of February 7, the association acknowledged the receipt of the check, but again insisted upon the certificate before sending a receipt. Another blank

was inclosed.    Receiving no reply to this letter, the secretary of the association again wrote under date of February 19, inclosing another blank, and calling for the certificate.    It was shown on the part of the association that on March 8 another letter of the same import was sent to Mee, in which was another blank.

In March an assessment was made as of the first secular day in April, on account of the death of members, two of whom had deceased after the alleged default in payment of the December assessment.    March 31 notice of the assessment was mailed to Mee, and he was therein requested and required to pay on or before May 2. The notice was in the usual and customary form, notifying him, among other things, that if he failed to pay on or before the day last mentioned his rights to the benefits of membership would terminate.    He was also urged to give heed to the notice, in order to avoid all possibility of terminating his membership.    The association had, on March 14, sent the other note for $45, about to mature, to a bank in Duluth for collection, and notice of this had been mailed to Mee before he died.    April 2 the association forwarded to the same bank a list of its members at Duluth, with a statement of the amount due from each on the April assessment, and receipts to be delivered to each on payment, the receipts being dated May 2. Two days after Mee's death, his brother, the beneficiary, went to the bank, informed the cashier of the death, asked him if he should pay the amount of the note and of the assessment, and was advised that the money would be received.    The amount of the note was paid that day, and the money immediately remitted to and received by the association.    April 12 the beneficiary paid the amount of the assessment, receiving the receipt of date May 2.    The association returned the check sent for the December assessment on April 24. It first learned positively of the death a day or two afterwards, and at once wired the bank to return the amount of the April assessment to the party who paid it.    This was not done, but on May 2 it mailed its own checks for the amount thus paid, and for the amount paid on the note, to attorneys who were acting for the beneficiary.    The latter declined to receive the sums, and the checks were returned to their maker.        .

That the association had no knowledge and had no reason to sup-

pose the assured to be in ill health at any time, seems to be conceded. Its officers knew nothing of his sickness until informed of his death.

On these facts the question arises whether the court below was justified in holding as a proposition of law, and conclusively, as it did when it directed a verdict in favor of the defendant, that the contracts had ceased to be in force some months prior to Mee's death, had then been forfeited, and that there was no evidence from which the jury could have determined that there had been a waiver of the forfeiture.

The law seems to be well settled, and has frequently been acted upon, that if, in negotiations or transactions with the assured after knowledge of the forfeiture, the insurer recognizes the continued validity of the policy, or does acts based thereon, the forfeiture is, as a matter of law, waived, and such a waiver need not be based on any new agreement or an estoppel. Titus v. Glens, 81 N. Y. 410, and cases cited. See, also, upon the subject of waiver, Rice v. New England, 146 Mass. 248, 15 N. E. 624; Jackson v. Northwestern, 78 Wis. 463, 47 N. W. 733; Murray v. Home, 90 Cal. 402, 27 Pac. 309; Metropolitan v. Windover, 137 Ill. 417, 27 N. E. 538; Beatty v. Mutual, 21 C. C. A. 227, 75 Fed. 65, and citations. In the case of Queen v. Young, 86 Ala. 424, 5 South. 116, the court used the following language:

"Though the waiver may be in the nature of an estoppel, and maintained on similar principles, they are not convertible terms. The courts, not favoring forfeitures, are usually inclined to take hold of any circumstances which indicate an election to waive a forfeiture. A waiver may be created by acts, conduct, or declarations insufficient to create a technical estoppel. If the company, after knowledge of the breach, enters into negotiations or transactions with the assured which recognize and treat the policy as still in force, or induces the assured to incur trouble or expense, it will be regarded as having waived the right to claim the forfeiture."

To the contention that a waiver of the forfeiture necessarily involves an intention to waive, and that from the evidence of the secretary it conclusively appeared that the defendant did not intend to waive this forfeiture, it may be said that such a rule would allow a secret intention to defeat the legal effect of unequivocal and de-

liberate acts. The secret intention, if there was one, to consider the insurance certificates as forfeited unless the health certificate was furnished, cannot be allowed to prevail against the acts of the officers of the association. It had, upon receipt of the check for the December assessment, insisted that the assured execute and return this certificate, and it made demand for the document at different times thereafter. Its acts might clearly indicate an intention to waive a forfeiture, or merely that they were performed in anticipation that Mee would furnish the required certificate, and pay up; and were conditioned upon his doing so. But its subsequent conduct might be regarded as a waiver of the condition which it had previously imposed. It could not insist upon a forfeiture, and at the same time, by word or deed, treat the contracts as still in force. The right to insist upon and enforce a forfeiture may be effectually waived if the party entitled to thus insist and enforce, after, and with knowledge of, the default, treats the contract as in force, and deals with the other party in a manner consistent only with a purpose on its part to regard the contract as still subsisting, and not terminated by the default.

Finally, the plaintiff was not concluded, as counsel for defendant insists, because the association had no knowledge of Mee's illness when it made the April assessment. It had knowledge of the default, and that in response to the requests for a health certificate none had been sent. If it desired further information on this subject, inquiry should have been made. As was said in the Rice case, supra, "it acted under no deception or misrepresentation, but it had all the information which it cared to take the pains to acquire." Of course, if it should appear that the deceased or his beneficiary were attempting a fraud on the defendant by endeavoring to get the former restored without furnishing a health certificate, and the defendant, in ignorance of the fraud, was thereby induced to do what it did, there would be no waiver of the forfeiture.

There was evidence, taking all of the circumstances into consideration, which would have supported a finding that the association had, by its conduct, waived the forfeiture, and had concluded to treat the contracts as still in force. On this question the case should have been submitted to the jury.

The verdict is set aside, and a new trial ordered.