GERALD SEAVEY, A MINOR, BY CLIFFORD K. ELLIS, HIS
GUARDIAN AD LITEM, v. DWAYNE ERICKSON
AND ANOTHER.
FARMERS INSURANCE EXCHANGE,
THIRD-PARTY DEFENDANT.
CLIFFORD SEAVEY v. FARMERS INSURANCE EXCHANGE
AND ANOTHER.[1]

April 1, 1955.

No. 36,356.

[1]Reported in 69 N. W. (2d) 889.

*Freeman & Peterson, M. W. Gaughan,* and *Henry M. Gallagher,* for appellant.

*Baudler & Baudler* and *Moonan, Moonan, Friedel & Senn,* for respondents.

KNUTSON, JUSTICE.

These two cases were tried together, and, by stipulation of the parties, they are treated as one appeal here although separate appeals have been taken from orders of the trial court denying new trials in both cases. The appeals in both cases involve the validity of a certain policy of insurance covering liability and property damage and collision on an automobile owned by Clifford Seavey.

On November 4, 1950, Clifford Seavey applied for a policy of liability and property damage insurance on a 1941 Mercury automobile. On November 13, 1950, he received such policy bearing No. 7873891, effective as of 2:15 p. m. on November 4, 1950, and good for six months to May 4, 1951. For convenience we shall refer to this policy as policy A. On January 8, 1951, the coverage on this policy was changed to a 1946 Ford automobile, and on July 6, 1951, it was changed to a 1951 Ford. On March 25, 1952, Clifford borrowed some money on the automobile from the First National Bank of Austin, and, upon application of the bank, collision and comprehensive coverage was added to the policy.

The policy is in the usual form of such insurance and contains, among other things, the following provisions:

"(18) CHANGES

"Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this policy or estop the Exchange from asserting any right under

the terms of this policy; nor shall the terms of this policy be waived or changed, except by endorsement issued to form a part of this policy, signed for FARMERS INSURANCE EXCHANGE, by an executive officer of its attorney-in-fact, the Farmers Underwriters Association.

\* \* \* \* \*

"(22) RECIPROCAL PROVISIONS

\* \* \* \* \*

"The entire policy shall automatically and immediately become cancelled and void upon the expiration date of any current term, if the named insured defaults in making payments of amounts required to maintain the premium deposit."

For some years prior to the issuance of policy A it had been the custom and practice of the insurer to issue three notices in connection with the payment of a renewal premium. The first was mailed to the insured about three weeks to 25 days before the premium was due. The pertinent portions of it read as follows:

"FARMERS INSURANCE EXCHANGE

"Semi-Annual Premium Notice

"St.-Dist.-Local-Policy Number-Comp. or F & T-Collision-Other Cov.

Please Pay
Correct

BI & PD                         AMOUNT DUE

"If all drivers in household are        and your TOTAL
25 years or older BI & PD rate is:      PREMIUM DUE IS:
"If you or any driver in household is   and your TOTAL
under 25 years old—BI & PD rate is:     PREMIUM DUE IS:

"Keep This Copy—It is Your Record of Payment

"Payment of this semi-annual premium at this office on or before the DUE DATE shown below, renews your insurance for the succeeding six months period.

"YOUR CANCELLED CHECK OR MONEY ORDER STUB WILL BE YOUR RECEIPT

"Renewal Date

"Post Office Box 2179, Kansas City, Missouri."

The second notice was mailed to the insured about nine days after the renewal premium was due. The material portions of this notice read:

"FARMERS INSURANCE EXCHANGE

"Please return this
notice with your
payment

"Policy Number—St.—Dist.—Local—Due Date
"If all drivers of your car in household are
25 years or older—your total amount due is:

"Please Pay
Correct
Amount

"If you or any driver of your car in household
is under 25 years old—your total amount due is:

"Doubtless you will want to be advised that the due date of your premium has passed and payment has not yet been received in this office. Assuming this is due to an oversight, we are extending time for payment as indicated in the next paragraph.

"If payment is received before midnight of the fifteenth day after the due date shown above, your policy will be reinstated as of its original due date without any interruption. If not, your policy will remain in a lapsed state as of the original premium due date. We believe you will want to take advantage of this provision and remit your premium at once.

"If payment has already been made, please disregard this notice.

"Farmers Insurance Exchange
Farmers Underwriters Association,
Attorney-in-Fact

"[signed] T. E. Leavey

President"

The third and final notice was sent about three weeks or 25 days after the due date, and it reads as follows:

"FARMERS INSURANCE EXCHANGE

"Clifford S Seavey
R R 5
Austin Minnesota

| "Policy Number | St. | Dist. | Local | Lapsed Date |
|---|---|---|---|---|
| 07873891 | 13 | 41 | 1 | May 4, 1952 ND |

"To Reinstate:

Please Pay "If all drivers of your car in household are
Correct      25 years or older—your total amount due is:      39.24
Amount      "If you or any driver of your car in household
            is under 25 years old—your total amount due is: 39.24

"May we suggest that you contact your agent and arrange for reinstatement of this policy? Reinstatement fee must be added after sixty days.

"Surely you agree that it is extremely hazardous to be without insurance protection. To be provided the opportunity of providing you with maximum protection is the purpose of this organization.

"Sincerely yours,
"[signed]   P. J. Chrisman
"P. J. Chrisman
Vice President in Charge
of Sales."

It is conceded that the first notice mentioned above was not sent to the insured in this case prior to May 4, 1952, the premium date. The insurer claims that such notice was not sent for the reason that, when coverage was changed by the addition of collision coverage, it sent the insured an endorsement showing such change in coverage which also included a statement as to the amount of premium which would be due. Such endorsement was used in place of the usual notice where coverage had been changed within a certain period prior to the due date. The insured claims that he did not receive the second notice. Based on its practice in sending out notices, insurer claims that it did mail such notice. There was no direct evidence that it actually was mailed. A copy of the notice customarily was sent to insurer's agent. He could not find such copy in his files. Based on

this evidence, the court found that the notice was not mailed and that the insured did not receive it. The third or final notice was mailed on June 3 and received by the insured on June 5.

The home office of the insurance company is in Los Angeles, California. All its business in this area is supervised by its branch office in Kansas City, Missouri. The offices of the company at Kansas City have full authority to act for it in any business transactions in the area under its control. For about 18 years prior to the time here involved, Waldo E. Johannsen was the district agent for the company in Austin, Minnesota. He had authority to collect premiums and to endorse checks made out to the company. It was his practice to deposit checks and other premiums paid and then remit to the company the aggregate collected by a check drawn on the account to which he had deposited the premium payments. The claim office of the company for servicing this area was located in Minneapolis.

The insured had done business with the company through Johannsen since about 1947. In addition to policy A he had other policies on other cars and trucks over this period of time and was familiar with the company's practice of sending out notices through his dealings with such policies. The premium due on policy A on May 4, 1951, was paid and accepted by the company on May 22, 1951. The premium due on November 4, 1951, was paid in October prior to the due date. The premium due May 4, 1952, was not paid when due.

During the early hours of June 4, 1952, the automobile covered by policy A, while being driven by defendant Dwayne Erickson with the owner's consent, was completely demolished when it was run into a bridge abutment. Shortly after the accident, the insured called Johannsen on the telephone and made arrangements to meet him as soon as he opened his office. The insured then paid Johannsen the sum of $39.24 by check, representing a premium of $15.69 for liability and property damage insurance and $23.55 for collision and comprehensive coverage. The check was deposited in the company account. Johannsen had full knowledge of the accident when he took the check. He gave the insured a receipt reading:

"Farmers Insurance
Group

"Receipt No.
C832567

"Time            9:15 PM            Date   6/4/1952

"Rec'd
 From          Clifford S. Seavey

"Street
 Address       R. R. 1

"City
 State         Austin Minn.

 "Due Date
Month    Day                    Rec'd By W. E. J.

"FARMERS Insurance Exchange—TRUCK Insurance Exchange—FIRE
                    Insurance Exchange
                       Class II

"State      Dist.     Local    Policy Number    Amount Paid
  13         41        01        7873891           39.24

"Renewal — New Bus. — Rein. — Add. Cov. — Application Attached
   x                           x              No"

Johannsen communicated with the claim department by telephone, and the Kansas City office was notified promptly of the accident. Remittance for the premium with a notation that it was paid as a renewal reached the Kansas City office on June 18. By that time the company had investigated the accident and had full knowledge of it. The premium was never returned but is still retained by the company.

On June 18 Johannsen wrote the company as follows:

"State _____ Dist. _____ L.A. _____ Date June 18, 1952

"To: Name K. C. Claims Department    Insured Clifford S. Seavey

 "Place _____    Policy or Claim No. 7873891
                                   Date of Loss 6/4/52

"FROM: State 13   Dist. 41   L.A._____

"Place Austin, Minnesota

"We have your claim label on the above insureds accident of above date and we are wondering just how this situation is to be handled.

This is one of the most serious accidents that has ever happened in this district.

"The policy, according to our records, was not in force at the time of the accident and the insured paid the premium the morning after the accident happened. The automobile, however, is worse than a total wreck. I imagine your file indicates its condition. There is of course no need of coverage on the automobile as it is totally destroyed and will never again be used. Our insured has another automobile also insured in the Exchange so the drive other car coverage probably wouldn't mean anything to him on that.

"I imagine he feels that the payment of this premium might have some bearing on his claim. I know that his argument is that he never received a premium call notice nor did he receive an advance notice of cancellation. It seems rather odd that these notices were not received because the actual lapse notice was received the same date that we received our copy.

"My concern of course is in regards to the premium being earned when there is no exposure. I would appreciate your suggestions.

"[signed]    Waldo E. Johannsen<br>"Waldo E. Johannsen

"WEJ :cr                      District Agent."

The company received this letter but made no reply. On July 26, Johannsen wrote the insured as follows:

"July 26, 1952

"Clifford S. Seavey
  R. #1
  Austin, Minnesota
"Dear Sir:          Policy #07873891.

"After you left this morning, I started checking through the file on the policy covering your passenger car and noticed that we hadn't sent out the reinstatement endorsement reinstating the policy as of June 4, the date the money was received. I know it was your intention at the time you paid your premium that this would pay up the policy. You will remember that I mentioned we had nothing in our file that indicated the policy had already lapsed although the pre-

mium date was May 4. It is my recollection that the day afterward we received the notice that the policy was already lapsed. This payment then would have no bearing on the accident that had already happened.

"At the time the reinstatement endorsement came back, the girl asked me if we should send it out inasmuch as the automobile was a total loss and would not be in use and there would be no need for the coverage. I told her we had better leave it in the file until we heard something definite from Kansas City.

"I talked this matter over with our supervisor and he stated that if the coverage was not desired that you should request cancellation and a refund of your premium. I don't know what your plans are as to whether you plan to buy another automobile and transfer the policy over to it. It would be my suggestion however that you either suspend the policy so that there would be no premium accruing while there was no automobile in use or cancel it and request the refund of your premium. In these circumstances, I am sure that the full premium could either be suspended or refunded. I would appreciate knowing what you wish to have us do.

"Very truly yours,

"[signed]    Waldo E. Johannsen

"Waldo E. Johannsen

"WEJ:cr                District Agent."

Shortly after the accident, Donald A. Penny of the claim office appeared on the scene. He had the wreckage of the car hauled to a junk yard and paid for the hauling. He took statements from the parties involved in the accident.

The company denied liability under the policy on the ground that it had lapsed at the time of the accident. Actions were brought by Clifford Seavey to recover for damages to his automobile under the collision provisions of the policy and by Gerald Seavey, by his guardian *ad litem,* to recover for personal injuries sustained while riding as a passenger in the automobile at the time of the accident. In the latter action the insurer was made a third-party defendant, and it was agreed that the issue of liability should be litigated with

the action brought by Clifford Seavey under the collision provisions of the policy. Findings on these issues were made by the court against the insurer, and it brings this appeal from orders in these two actions denying motions for a new trial.

The only issue presented here is whether the policy had lapsed or whether the insurer is liable for the damages resulting from this accident.

■ The trial court's decision in upholding the validity of the insurance policy is based largely on its conclusion that the insurer by its conduct had waived any forfeiture of the policy.[2] It is the contention of the insurer that by the terms of the policy nonpayment of the premium caused a termination of the insurance without any further act on its part. In avoiding the express provisions of the policy causing a termination, the insured relies upon acts of the insurer to establish an estoppel to assert, or a waiver of, the forfeiture provisions of the policy. While the courts frequently fail to distinguish between estoppel and waiver in cases such as this, there is a distinction that should not be overlooked. Probably as good a definition as any of waiver and estoppel in insurance cases is the following statement in Prosser, *The Making of a Contract of Insurance in Minnesota,* 17 Minn. L. Rev. 567, 594:

"* * * Waiver is the intentional relinquishment of a known right; it is the expression of an intention not to insist upon what the law affords. It is consensual in its nature; the intention may be inferred from conduct, and the knowledge may be actual or constructive, but both knowledge and intent are essential elements. Estoppel, on the other hand, is not consensual in character. It is recognized, not to give effect to a presumed intention, but to defeat the inequitable intent of the parties estopped."

The distinction has been recognized by several of our decisions. Mee v. Bankers' L. Assn. 69 Minn. 210, 72 N. W. 74; Parsons, Rich & Co. v. Lane, 97 Minn. 98, 106 N. W. 485, 4 L.R.A.(N.S.) 231.

---

[2] The insurer claims that we are dealing with an automatic cancellation of the policy and not a forfeiture. The terms are used somewhat interchangeably in the cases, and it is immaterial here whether we refer to the termination of the policy as a forfeiture or cancellation.

In the application of these two doctrines cases may arise, such as the one now before us, where both estoppel and waiver, even though distinguishable, may be present. Strictly speaking, estoppel works to prevent a forfeiture, while waiver presupposes a right to declare a forfeiture and such conduct on the part of the insurer, after the right to declare a forfeiture arises, as to justify a conclusion that the insurer did not intend to assert its rights in that respect. Of course, if there is an effective estoppel to declare a forfeiture, it should follow that it would not be necessary to consider the question of waiver for the reason that, the estoppel having prevented a forfeiture, there would be nothing to waive. However, inasmuch as the trial court apparently has considered the two terms as somewhat synonymous, we may consider both questions here. There may be such waiver as to create an estoppel, but waiver need not always be present to establish estoppel, nor need estoppel be present to establish a waiver. If there is evidence to establish either an estoppel or a waiver, the decision in this case should be affirmed.

While the evidence is in dispute, the court's finding that the insurer did not give the customary notice in this case is sufficiently sustained by the evidence. It would serve no purpose to relate the testimony of the witnesses on this issue. The authorities are not in agreement as to whether an insurer may declare a policy of insurance forfeited for nonpayment of a premium where it has been established that it was the insurer's custom to give notice of the due date of the premiums and it fails to give such notice. 29 Am. Jur., Insurance, § 395; Annotation, 20 L.R.A. (N.S.) 1037. We are committed to the rule that failure to give such notice may estop the insurer from declaring a forfeiture. In Ibs v. Hartford L. Ins. Co. 121 Minn. 310, 317, 141 N. W. 289, 292, we said:

"* * * It was the long-continued and uniform custom of the company to give the insured notice of each demand for dues. While the policy did not expressly require such notice, it did not expressly say that notice was unnecessary. It did provide that a printed or written notice, addressed to the member, should be sufficient for all purposes, and reasons may be suggested for the adoption of the uni-

form custom to give notice. * * * There is abundant ground, both on principle and on authority, for holding, as we do, that, having given the insured the right to believe that notice of the amount and time for payment of his dues would be given him, the company cannot forfeit the policy for a failure to pay dues as to which no notice has been given."

In Brown v. State Auto. Ins. Assn. 216 Minn. 329, 12 N. W. (2d) 712, which is relied upon to a great extent by the insurer, a policy of automobile insurance was involved containing conditions quite similar to the ones here involved. Such conditions provided for a termination of the insurance upon nonpayment of the premium, and, in addition, the policy contained the following provision (216 Minn. 333, 12 N. W. [2d] 714):

"* * * No notice of any kind or character shall be necessary to terminate or cancel this policy as provided by this paragraph."

To that extent it differs from the conditions contained in the policy now before us. In that case we said (216 Minn. 340, 12 N. W. [2d] 717):

"Where, as here, there is no statutory or contractual provision requiring the insurer to take some affirmative action declaring a forfeiture, the insurance automatically lapses and terminates for nonpayment of the premium under the policy provisions that the policy shall automatically lapse and terminate for nonpayment of the premium when due and that no notice of any kind shall be necessary to terminate or cancel the policy."

We did, however, go further and recognize the rule in the Ibs case when we said (216 Minn. 340, 12 N. W. [2d] 717):

"* * * In some cases where a custom of giving notices not required by the policy has been established, in consequence of which the insured is misled by failure of the insurer to give the notice, notice is required notwithstanding policy provisions that the policy shall automatically lapse for nonpayment of premium."

We believe the better rule to be that, where it has been established that it is the custom and practice of the insurer to give notice of the

time for payment of a renewal premium and knowledge of such custom is acquired by an insured in dealings with the insurer, the insured has a right to rely on such notice, and, in the absence thereof, the policy may not be terminated or forfeited without giving the insured some notice that such custom has been abandoned.[3]

Any other rule simply would create a trap which could be used as a convenient device to work a forfeiture when it was to the interest of the insurer to invoke the express provisions of the policy and permit it to waive such provisions and collect the premium when it was to its interest to do so. In this case, for example, it is the claim of the insurer that, even though it is not provided by the contract, it did grant a period of 15 days grace. Its second notice so states on its face. It contends that, if the premium is paid within the 15-day grace period, the policy will be continued in force as if no forfeiture had occurred but that, if the premium is paid after the 15-day period, the policy will have lapsed from the due date of the premium and that a new period of insurance then will commence from the date of the payment. The difficulty with its position is that the insurer's own conduct does not sustain its position. The premium due May 4, 1951, was paid and accepted on May 22, which was 18 days late. If the insurer's contention is accepted, a new policy date should have been established as of May 22. If that were true, the next premium would be due on November 22 and the following premium on May 22, 1952. If we then add the 15-day grace period to that due date, the insured would have had until June 6 within which to pay the May premium, in which event there would be no dispute here since the premium was paid on June 4. The insurer, having established the custom of giving notice, is now estopped to declare a forfeiture in the absence of such notice.

It is the contention of the insurer that the court erred in admitting evidence to show the custom and practice of the insurer in sending out notices. The insurer argues that, inasmuch as the insured had never received any notices relative to policy A, there could be no reliance on such notices; hence, that there can be no estoppel. It

---

[3]See, 45 C. J. S., Insurance, § 712; 14 Appleman, Insurance Law and Practice, § 8199; 3 Joyce, The Law of Insurance (2 ed.) § 1334.

also argues that the practice of sending notices on other policies can have no bearing on establishing a custom so as to estop the insurer from declaring a forfeiture on this policy. The evidence shows that the insured had held another policy of exactly the same type on automobiles and trucks at least since 1947. He had received notices such as described above on this policy many times. While there may be authority to the contrary, it would appear to us that, where the insurer had dealt with the insured over a period of time on identical types of insurance, the insured should be justified in relying upon the custom and practice of the company in giving notice of the due date of premiums even though the knowledge of the insured had been acquired in dealings relating to other policies which he held. It could hardly be supposed that an insured holding several policies of insurance of identical types with the same company would assume that it would follow a practice of giving notice on one policy and not on another. Cases holding that an insured may not rely on a custom followed with respect to other holders of insurance are not in point. Here the knowledge acquired by the insured relates to his own dealings with the insurer on identical policies of insurance. Under these circumstances, the court did not err in admitting evidence of custom and practice followed with respect to such other policies.

On the question of waiver, also, the decision here must go against the insurer. Here, also, there is considerable dispute in the authorities as to whether some of the acts relied upon for waiver in this case will constitute waiver. The evidence shows that, with full knowledge of the accident, the company accepted and retained the premium. It demanded and received co-operation from the insured in investigating the accident. It took charge of, and paid for, disposal of the wreckage.

In Mee v. Bankers' L. Assn. 69 Minn. 210, 217, 72 N. W. 74, 77, we said:

"The law seems to be well settled, and has frequently been acted upon, that if, in negotiations or transactions with the assured after knowledge of the forfeiture, the insurer recognizes the continued validity of the policy, or does acts based thereon, the forfeiture is,

as a matter of law, waived, and such a waiver need not be based on any new agreement or an estoppel."

This rule has been applied in many of our other cases as well. See, 9 Dunnell, Dig. (3 ed.) § 4686.

The facts in Bobo v. Farm Bureau Mut. Auto. Ins. Co. (E. D. S. C.) 119 F. Supp. 239, affirmed, Farm Bureau Mut. Auto. Ins. Co. v. Bobo (4 Cir.) 214 F. (2d) 575, are quite similar to those in the instant case. The court there held that acceptance of the premium after a destruction of the insured's property was a waiver of the forfeiture. While not many courts have considered this question, it seems to be the rule that, where the insurer has knowledge of the total destruction of the insured property and thereafter accepts a premium on insurance covering such property, it should be deemed to have waived a forfeiture of the policy. Johnston v. Phelps County Farmers' Mut. Ins. Co. 63 Neb. 21, 88 N. W. 142, 56 L. R. A. 127.[4] While the authorities are not in agreement, we believe that the rule to which we are committed is that acceptance and retention of a premium on a policy of insurance after knowledge of a loss is a waiver of a forfeiture, at least unless the insurance can have some application to the property which remains after the loss. See, 45 C. J. S., Insurance, § 716; Baughman v. Niagara F. Ins. Co. 163 Minn. 300, 204 N. W. 321.

In this case a large part of the premium covered collision insurance. At the time the premium was accepted the insurer had full knowledge of the fact that the insured car had been completely demolished. Its contention that it accepted the premium to reinstate the policy as of the day and hour when the premium was paid, to operate prospectively on an automobile it then knew was no longer in existence as an automobile, is hardly tenable. Acceptance and retention of the premium under these circumstances is consistent only with the recognition of the continued existence of the insurance

[4]For a subsequent history of the Nebraska cases, see German Ins. Co. v. Shader, 68 Neb. 1, 93 N. W. 972, 60 L. R. A. 918; Phelps County Farmers' Mut. Ins. Co. v. Johnston, 66 Neb. 590, 92 N. W. 576; Farmers' Mut. Ins. Co. v. Kinney, 64 Neb. 808, 90 N. W. 926; Johnston v. Phelps County Farmers Mut. Ins. Co. 73 Neb. 50, 102 N. W. 72.

coverage and not with its reinstatement. Added to this is the fact that the insurer demanded of the insured and received co-operation in investigating the accident; that it took charge of the wreckage and paid for its disposal; and that the receipt for the premium shows that it was accepted as a renewal and not as a reinstatement. Under these circumstances we must hold that the court's finding that there was a waiver is sustained by the evidence.

In view of our holding on the decisive issues, we need not determine other questions raised by the appeal. The extent of the agent's authority is not involved for the reason that all the acts upon which estoppel or waiver is based are acts of the company. It failed to send the notices; it retained the premium after having full knowledge of the facts; and it must be assumed that its claim agents acted with its consent.

Affirmed.

MR. JUSTICE FRANK T. GALLAGHER took no part in the consideration or decision of this case.