[No. 37325.    Department Two.    January 27, 1966.]

BERTHA M. ALLEN, *Appellant*, v. THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, *Respondent.*\*

*John R. Kramer* (*Smith Troy,* of counsel), for appellant.

*Robert A. Purdue* (of *Montgomery, Purdue, Blankinship & Austin*), for respondent.

DONWORTH, J.—This is an appeal from a summary judgment dismissing an action brought by the beneficiary named

\*Reported in 410 P.2d 586.

in a policy of life insurance to recover the sum of $20,000 alleged to be payable to her upon the death of the insured if he should die as the result of an accident.

Appellant was the mother of the insured (John R. Allen), who died in Olympia on October 10, 1959, as the result of an automobile accident. Respondent insurer refused payment under the policy on the ground that the policy had lapsed prior to the death of the insured because of nonpayment of premiums as provided therein.

Each party moved for summary judgment. The trial court denied appellant's motion but granted respondent's motion and dismissed the action.

The record contains various affidavits and the deposition of appellant (taken by respondent), which set forth the material facts bearing upon the sole issue of law, to wit, whether the life insurance policy involved was in effect at the date of death or had lapsed because of nonpayment of premiums in accordance with its terms.

There is no dispute as to a material fact, but, in order to understand the background and circumstances under which the policy was issued and the premiums were payable, it is necessary to state the facts in some detail.

At the time the application for the policy was made, appellant's son, then 17 years of age, lived with his mother in Colorado Springs, Colorado. His father was then, and had been for more than 20 years, serving in the United States Army. His father was stationed in Korea during the period referred to in this case.

The insured had enlisted in the United States Navy in February, 1958. On May 31, 1958, while on leave, he signed the application for the policy in question at Colorado Springs, designating appellant as sole beneficiary. The application provided for a monthly premium of $9.10 per month, which sum accompanied the application. Respondent delivered the policy to the insured on June 9, 1958. It was dated June 5, 1958.

The policy provided for *quarterly* premium payments of $26.90 instead of monthly payments of $9.10 (as stated in the application) because, as respondent's agent informed

appellant and the insured at the time of delivery of the policy, respondent did not accept monthly premiums of less than $10. Accordingly, appellant, on her son's behalf, paid the agent the additional sum of $17.80 in order to complete the payment of the first quarterly premium for the period from June 5 to September 5, 1958.

On August 13, 1958, the insured signed an allotment authorization directing the Navy Allotment Department to pay the sum of $9.10 to respondent each month beginning in September. The Navy, beginning in September, 1958, deducted $9.10 from the insured's pay and forwarded to respondent one check at the end of the month which was in payment of *all* premium allotments of *all* service men who were insured by respondent. Respondent, by Ord. 392,[1] made an exception (applicable only to persons in the military service who made allotments payable to respondent) to its rule that it would not accept less than $10 as a monthly premium.

Appellant, during this period (the summer of 1958), was living in Colorado Springs. About the fourteenth of each month, an agent of respondent's called at her home and collected monthly premiums on other Prudential policies. She gave him the amount he asked for.

On September 24, 1958, respondent's agent came to appellant's home to collect another *quarterly* premium on the policy in question. In appellant's deposition, she states:

A. Well, the agent came and said that the allotment had not been received and that he was to collect for the

[1]Ord. 392 is not quoted in the record but the affidavit of the attorney in respondent's Western Home Office at Los Angeles contains the following statement: "5. The records and files of Prudential show that the application for the policy called for monthly payment of premiums but that the policy was issued on the basis of quarterly premium payments because the monthly premiums would have been under $10.00 and company policy was to require at least quarterly periods of payment when the monthly amount would be less than $10.00. The files and records further show that Prudential permitted the change of the premium payments to monthly intervals as of September 5, 1958 because the insured had made a government allotment, an exception to the policy previously mentioned being allowed in such instances under Ord. 392."

insurance, and very reluctantly I paid it because I was quite short on funds at that time, but I wanted the insurance kept up to date. Q. All right. Now, you subsequently learned, did you not, that the allotments had started in September and that there was a refund due with respect to this $26.90? A. No, I never knew exactly when the allotment started. My son was at sea and he was, he had no way of checking. He knew at the time when the money was withheld from his pay, but to know when the allotment started. I don't know. Q. Well, he knew that his September paycheck had had the allotment withheld from it? A. No, no, he did not know. All he wrote to me, that he had applied for it, and I received a letter that was written in September, and in the letter he stated that he had applied for allotment.

Accordingly, appellant paid the agent the quarterly premium for the period from September 5, 1958 to December 5, 1958.

The record shows that the monthly allotments of $9.10 were paid by the Navy to respondent each month for 12 consecutive months from September, 1958 to and including August, 1959. When the insured was discharged from the Navy on September 2, 1959, he instructed the Navy Allotment Department to make no more payments to respondent after August, 1959.

In March, 1959, respondent refunded to appellant the sum of $27.30 (which respondent's records indicate was a premium refund of $26.90 plus 40 cents interest) under the following circumstances according to appellant's statement in her deposition, which reads:

Q. Sometime between September of '58 and March of '59, did you not have discussions with the Prudential representative relative to getting a refund of this $26.90? A. What were those dates, please? Q. Between September of '58 and March of '59. A. Well, yes, I had mentioned to him that if there was any over-payment, that I needed it desperately. I was in such a financial bind that I needed every penny I could, that I had coming to me. Q. And with whom did you discuss that? A. With Mr. *Ray Steadman*. Q. Did he tell you that he would check in to see if there was an over-payment? A. Well, he said that over-payment would be returned to

me. Q. And then is that what led to—oh, excuse me, I am showing you a check dated March 3, 1959, in the amount of $27.30, payable to John R. Allen, and will ask you if that is the check that resulted from those conversations as to a refund? A. Yes, I presume that it was. Q. Now, that check was delivered to you, was it not, by Mr. Steadman? A. I don't remember whether he brought it or whether it was sent in the mail. I don't remember that.

About April 1, 1959, appellant moved from Colorado Springs to Olympia. After she had moved to Olympia, appellant had no call from, or contact with, any agent of respondent's between that date and her son's death about six months later. As stated above, while she lived in Colorado Springs, she was accustomed to having an agent call on her at her home each month to collect premiums due on other Prudential policies and discuss matters relative to the premium payments on the policy in question.

Regarding her lack of contact with respondent's agent after receipt of the refund check of March 3, 1959, she deposed:

Q. After receiving the refund check of March 3, 1959, did you have any further discussions with anyone representing Prudential concerning John's policy until after his death? A. No. Q. Did you have any correspondence with Prudential relating to this policy between March of '59 and some date after his death or, and the time of his death? A. No. Q. Do you know of any correspondence that John had between March of '59 and the time of his death? A. No. Q. Do you know whether he had any conversation with any representative of Prudential concerning his policy? A. I don't know. He was only home a short time before he was killed. Q. Did you have any discussions with him after he returned home, prior to his death, concerning this policy? A. Yes, he stated that it was paid for September according to the money that he drew when he was discharged, that they paid for his insurance. Q. The money that he drew on or about September the 2nd? A. Yes. Q. Had had deducted from it— A. An insurance premium. Q. Is that what he said? A. No, no, that is not what he said. Q. What did he say? A. He said he thought his insurance

was paid for September because he should have drawn more money than he did, and he was under the impression that the allotment, I presume now that the allotment was paid, I don't know. Q. Did you have any discussion with him on or about October 5th relative to paying the next premium? A. No. Q. Do you know of any correspondence that he may have had with Prudential relating to how he should start paying premiums? A. No. Q. Do you know of any conversation— A. No. Q. (continuing)—that he had with anyone at Prudential? A. No. Q. Then other than the discussion with you, as far as you know, neither he nor you did anything about the payment of these premiums after he returned from the Navy? A. No. Q. Did he say that he thought that two allotments for premiums had been held out of his last check? A. All he said was that he thought his insurance was paid, that it should have been paid for September. Q. Because his check was less than usual? A. Yes, it was less than what he expected. Now, that is as nearly as possible his words. It's hard to remember back, but he wasn't concerned about it. Q. When did he return home? A. He returned, or he came home on a Saturday, which would, whatever date it would have been after the 2nd, I don't know. Q. Well, it would be the first Saturday after September 2nd? A. Yes.

The policy provided that the premiums were due on the 5th of the month because the policy was dated June 5, 1958. As required by RCW 48.23.030, the policy also granted the insured a period of 31 days' grace after the due date within which a premium could be paid without loss of rights under the policy.

The vital question is whether, under the undisputed facts shown in the affidavits and appellant's deposition, respondent is estopped by its course of conduct to deny that the policy was in effect at the time of the insured's death.

After the insured was discharged from the Navy on September 2, 1959, neither he nor his mother received any communication from respondent, either oral or written, concerning the policy in question. They were not informed as to whether the last allotment payment received from the Navy covered the September 5 premium nor were they informed as to whether respondent would continue

to accept premium payments on a monthly basis ($9.10) or whether the insured, being no longer in the military service, must thereafter pay premiums on a quarterly basis ($26.90). See footnote 1.

It is clear from appellant's deposition that her son understood from the amount of terminal pay he received at the time of his discharge from the Navy on September 2, 1959, that the September 5 premium had or would be paid by the Navy Allotment Department. He so informed appellant when he came home to Olympia after his discharge. Neither he nor appellant were informed by respondent as to these matters.

If the insured and his beneficiary had been informed by respondent on or before September 5, 1959, that the last allotment had paid the August 5th premium and that the insured or his mother would have to provide the money to pay the September 5 premium (whether it was $9.10 or $26.90), it is reasonable to presume that the proper sum would have been paid to respondent within the period of 31 days after September 5 (on or before October 6, 1959— 4 days before the death of the insured).

If an agent of respondent's had called at appellant's home in Olympia during September, 1959, it is reasonable to assume, based upon respondent's method of doing business with appellant in the past, that appellant would have been informed that the next premium had to be paid within 31 days after September 5 in order to avoid a forfeiture of the benefits of the policy ($20,000). Indeed, appellant would presumably have paid the premium to respondent's agent immediately, as she had always done with respect to other Prudential policies, as well as with respect to the policy in question.

Thus, by appellant's paying the sum of $26.90 to respondent on or before the expiration of the period of grace on October 6, 1959, the policy would have been kept in good standing until the date of the insured's accidental death on October 10, 1959.

Unfortunately, for no explained reason (except that it is argued that respondent had no such contractual or statu-

tory duty), there was no contact made by respondent insurance company with the insured or with appellant in any manner between September 5, 1959, and the death of the insured.

This court, in *Morgan v. Northwestern Nat'l Life Ins. Co.*, 42 Wash. 10, 84 Pac. 412 (1906), considered an instruction given to the jury in a case which involved the acceptance by the insurer over a period of 9 months of monthly premiums paid by the insured from 9 to 30 days after the due date. The policy contained no provision for a period of grace. The trial court's instruction in that case stated:

"Now, if you find from the evidence that she made all of the payments of these monthly installments of premium toward the latter part of the month, after the making of the new arrangement, and that the company received them without objection and without calling her attention to the fact that they were payable sooner, and if you further find that, by such course of dealing, she as a prudent person was led to believe, and did believe, that she was making these payments according to the terms of this new arrangement, by making them at any time during the month—if you find that she so understood the new arrangement, and that the custom and conduct of the company in receiving these payments without objection were calculated to lead an ordinarily prudent person to so understand and believe, and that she was thereby induced to rest in that belief and understanding at all times previous to her death and that, in consequence of such conduct on the part of the company, she had good reason to believe, and did believe, up to that time that she had paid all these installments as they became due, and that the last one was then overdue—if you find all these facts from the evidence in the case, then I instruct you that the company is estopped and has waived its right to insist upon the forfeiture of this policy by reason of the nonpayment of the last installment of premium, and in that case your verdict should be for the plaintiff." (p. 12)

In approving the foregoing instruction, this court said, at p. 13:

This instruction seems to us to be so fully and completely in accord, not only with the established princi-

ples of law, but with the universally accepted principles of good morals, that it is difficult to make an argument in its defense. The rule announced by the court could certainly not be questioned if it were applied to the dealings of individuals with each other, for no individual would be allowed by his attitude, his conduct, and long-continued custom of doing business with another individual, to mislead him to his disadvantage. And, if so, why should not the same rule control insurance companies, where confessedly parties do not stand upon the same level footing as do individuals in making contracts with each other? The instruction was guarded and made to apply only to persons ordinarily prudent, and if such ordinarily prudent person, by the course of conduct of the company, was misled to her disadvantage, the party who misled her cannot claim any advantage from such wrongdoing.

Respondent attempts to distinguish the *Morgan* case on the ground that in the present case the policy did contain a provision for a 31-day period of grace, and hence the insurer was obligated to accept the late payments. This is not a material distinction.

The central fact in the maze of transactions which misled the insured and his mother, appellant, did not occur because of their knowing reliance on the grace period over a period of time within which to pay premiums. It occurred because neither the insured nor the beneficiary knew how the allotments were being credited by the insurance company toward the premium. *Only the insurance company knew* that prior to the refund it was receiving premiums about 2 months and 4 days in advance, but that after the refund it was accepting premiums, through the allotment, about 27 days late[2] (depending on the length of the month,

[2]The insurance company argues that it had no choice but to refund $27.30 in view of the request of Mrs. Allen. This is not true. The deposition of Mrs. Allen shows that her request was received by the insurance company agent perhaps as early as October, 1958. She did not ask for a refund of a particular amount or payment, or that the refund be made on a particular date. She requested only that the excess premium be refunded. The amount of excess premium depended on the date for the accounting selected by the insurance company. If, for example, the date of the accounting for the purpose of this refund

and the mailing time to transmit the check from the Navy Allotment Department to the insurance company). Because the effect of the refund was not known to them, the insured and appellant had reason to believe, to the best of their knowledge, as reasonably prudent persons, that the premiums were being paid in advance by the allotment, and that the allotment taken from the insured's separation pay was credited to the September 5, 1959 premium. The insured and appellant could be secure in this belief because the insurer had previously notified them in connection with this policy whenever the premium was due or overdue and the policy was in danger of lapse. Therefore, it seems obvious that whether or not there is a grace period is not decisive of the case.

The general statement in the *Morgan* decision that persons dealing with insurance companies "do not stand upon the same level footing as do individuals in making contracts with each other," and that an insurance company should not be allowed by its conduct to mislead an insured to his disadvantage, is clearly applicable.

A brief summary of the facts shows how the insured and appellant were confused and misled.

May 21, 1958—insured applied for insurance and wished to pay a monthly premium which he was told by the agent would be $9.10. He was then in the Navy.

June 9, 1958—the policy dated June 5, 1958, was delivered to the insured. He was informed by the agent that the insurer could not accept monthly premium payments of less than $10. Therefore, quarterly payments of $26.90 must be paid. Accordingly, the additional amount of $17.80 was paid in order to comply with respondent's requirement.

August 13, 1958—the insured executed an allotment au-

had been made at any other time than between the first and the fifth of each month (during the perhaps five months between the time the agent first received the request for a refund, and the time the insurance company issued the check), the refund could not have been *equivalent* to three months' premium ($27.30) but could only have been *equivalent* to two months' premium ($18.20). Hence, the insurance company determined the amount of excess premium and the amount of the refund by its choice of an accounting date for the refund.

thorization for the payment of $9.10 each month to respondent.

September 24, 1958—the beneficiary, at the suggestion of respondent's agent, paid $26.90 for a second quarterly premium, because the insurance company had not yet received any allotment payments for the premium on this policy.

From October 1, 1958, to September 1, 1959, respondent received and accepted 12 monthly payments of $9.10 each from the Navy. Only the insurance company knew how these allotment payments were credited on receipt thereof each month.

Meanwhile, on or after March 3, 1959, respondent delivered to appellant a check for $27.30 (apparently $26.90 premium refund plus 40 cents interest), stating to her that this was a refund of the surplus premium credited to this policy. No statement was made as to the effect of this refund on the manner of crediting the monthly allotment payments received from the Navy. Neither the insured nor the appellant knew of the accounting effect of this "refund."

In the present case, an 18-year-old sailor did not correctly understand the complicated activities on the part of the insurance company. Respondent had apparently discontinued its prior custom of having its agent make calls on appellant beneficiary or the insured whenever premiums were due which were not paid by the allotment, but it had given no warning of such change to appellant or the insured, and the potential lapse had not arisen since the last contact by an agent, in September, 1958. The insured believed that the September 5, 1959 monthly premium had been paid, and, therefore, that the 31-day grace period would begin on October 5, 1959. The insurance company did nothing to change this belief, although it knew or should have known of the problem when the September 5, 1959 premium was not paid, because no allotment payment was made on September 30, 1959. At least, on October 1, 1959, if not before, the insurer should have notified the insured of premium due *prior* to the lapse of the policy. *Instead,* the insurance company did nothing, regardless of its prior course of

dealing, and allowed the insured to believe that he was covered up to the time of his death, on October 10, 1959, since which time the insurer has refused payment of the claim of appellant beneficiary on the ground that the policy had lapsed prior to death.

We cannot accept the insurance company's position. We think that these facts established that the insurance company is estopped to claim lapse of the policy because of its prior course of dealing with the insured and its superior knowledge of the facts.

In other jurisdictions, as well as our own, an insurer has been held estopped when its agent has customarily notified the insured of the premium due or the danger of lapse or cancellation. See *Seavey v. Erickson*, 244 Minn. 232, 69 N.W.2d 889, 52 A.L.R.2d 1144 (1955).

We have a similar case (although the kind of insurance and the factual details were different) in *Blomquist v. Grays Harbor Medical Serv. Corp.*, 48 Wn.2d 718, 296 P.2d 319 (1956). Respondent attempts to distinguish this case on the ground that no grace period was involved therein. As pointed out above, we do not think that distinction is important in the case at bar.

In the final analysis, the underlying theory is best expressed in one of our own older cases, to wit, *Boutin v. National Cas. Co.*, 86 Wash. 372, 150 Pac. 449 (1915), where this court stated, at p. 377:

> It may be conceded that, if, through the fault of the insured or the beneficiary under the policy, the premiums were not paid, the policy would lapse. But where the fault is the fault of the insurance company, and not the fault of the assured or the beneficiary, certainly the policy ought not to lapse.

Respondent has argued that *Vernon v. Equitable Life Assur. Soc'y*, 15 Wn.2d 94, 129 P.2d 801, 146 A.L.R. 642 (1942), and *In re Simon's Estate*, 30 Wn.2d 278, 191 P.2d 313 (1948), require that it be guilty of inconsistent conduct (or any other estopping or misleading actions) that might or did induce either the insured or the appellant to make a change of position. Respondent further states that there

is nothing in the record even suggesting that either one relied on or was misled by the premium refund or any other act on the part of respondent. We have set forth above respondent's acts and failure to act (including its change in its custom of having its agent collect premiums monthly) which misled appellant and the insured as to the time when his next premium would become due.

Respondent also argues that, under our decision in *Wechner v. Dorchester*, 83 Wash. 118, 145 Pac. 197 (1915), the party claiming estoppel must have been destitute of knowledge of the facts and that there was no convenient and available means by which the party claiming estoppel could have acquired such knowledge.

We accept respondent's statements of the law. We think, however, that the rules applied in these cases are applied to an entirely different state of facts from those in the present case.

In the case of *Vernon v. Equitable Life Assur. Soc'y, supra,* the insurance company gave *written notice of lapse* before the insured died. The only issue was whether the company was estopped to show when the extended insurance started to run. *If* the respondent in the case at bar had given notice of lapse here— with the opportunity of reinstatement offered in the *Vernon* case—there would be no doubt that respondent would have fulfilled its responsibility to the insured and the beneficiary.

The cases of *In re Simon's Estate, supra,* and *Wechner v. Dorchester, supra,* are cases where neither party was an insurance company with far superior knowledge, or a prior course of dealing.

Since we hold that, under the undisputed facts in the record, respondent is estopped to forfeit the life insurance policy involved in this case and had no legal right to deny appellant's claim as beneficiary thereunder, it follows that the trial court erred in granting respondent's motion for summary judgment of dismissal.

It further follows that, for the reasons stated above, the trial court erred in denying appellant's motion for summary judgment.

Therefore, the judgment of dismissal is reversed with instructions to enter judgment against respondent and in favor of appellant for the total amount of her claim ($20,-000) less amount of one quarterly premium of $26.90 (plus interest thereon at 6 per cent per annum from September 5, 1959 to date of judgment). Such judgment shall bear interest at the rate of 6 per cent per annum from October 10, 1959. Appellant shall recover her costs of this appeal.

It is so ordered.

ROSELLINI, C. J., WEAVER and HAMILTON, JJ., and SHORETT, J. Pro Tem., concur.