Casey AMOS and John Tice, Appellants
and Cross–Appellees,

v.

ALLSTATE INSURANCE COMPANY and
Beth Lancaster, Bertha Tatum, Jack Ta-
tum, and Joe Tatum, Appellees and
Cross–Appellants.

Allstate Insurance Company, Appellant
and Cross–Appellee,

v.

John Tice, Casey Amos, Bertha Tatum,
Jack Tatum, Joe Tatum, and Beth Lan-
caster, Appellees and Cross–Appellants.

Bertha Tatum, Jack Tatum, and
Joe Tatum, Appellants and
Cross–Appellees,

v.

Allstate Insurance Company, Beth Lan-
caster, John Tice, and Casey Amos,
Appellees and Cross–Appellants.

Nos. S–12396, S–12415, S–12465.

Supreme Court of Alaska.

May 23, 2008.

Steven D. Smith, Anchorage, for Appellants and Cross–Appellees Casey Amos and John Tice.

Alfred Clayton, Jr., Bliss, Wilkens & Clayton, Anchorage, for Appellant and Cross–Appellee Allstate Insurance Company and Beth Lancaster.

C.R. Kennelly, Anchorage, for Appellants Bertha, Jack and Joe Tatum.

Before: FABE, Chief Justice, MATTHEWS, EASTAUGH, and CARPENETI, Justices.

*OPINION*

MATTHEWS, Justice.

## I. FACTS

The main question presented in this appeal is whether a river boat driven by Jack Tatum was insured when it collided with a river boat driven by John Tice. The accident occurred on August 9, 2000, in a narrow bend of the Little Susitna River. Tatum was alone in his boat; Casey Amos was a passenger in Tice's boat. All three men were injured in the collision.

Jack Tatum co-owned his boat with his brother Joe. The boat had been insured under a boat owner's policy issued by Allstate Insurance Company to Joe Tatum and his wife Bertha in 1999. The policy was purchased at the Stan Tebow Agency in Palmer and included property, liability, and medical payments coverage. The boat owner's policy was subject to a "short rate" table under which the entire premium for the annual premium period is earned if the policy is in effect for a minimum of five months during the annual period.

In the year 2000 the Tatums were to pay the annual premium of $289 in six installments, including a $3.50 payment fee for each installment, beginning on April 6. Allstate did not receive the payment that was due on June 6, 2000. On June 16 Allstate mailed to Joe and Bertha Tatum notice that the policy would be cancelled for nonpayment on July 15 unless payment in the minimum amount of $99.84 was received before then. When on June 19 Allstate received a payment of $51.67, Allstate sent a notice to the Tatums that acknowledged receipt of this amount, and stated that the policy would still be cancelled on July 15 unless an additional $51.67 was received.

Allstate received no additional payments until August 14, 2000. On that day Bertha Tatum visited the Tebow Agency in order to make a payment. She did not mention the accident.[1] She was told that the payment for reinstatement of the policy would be $51.67 and wrote a check for that amount. In exchange, Bertha Tatum was handed a document captioned "Conditional Receipt" that provided:

> our acceptance of this payment does not (a) reinstate the policy, or (b) afford coverage for any accident, occurrence, or loss which took place before this receipt was issued. A refund will be provided if coverage is not reinstated. Notification will be provided if the coverage is reinstated.

The next day, on August 15, 2000, Allstate mailed to Joe and Bertha Tatum a reinstatement notice stating that the policy was cancelled effective July 15, 2000, and reinstated on August 15, 2000.[2]

On August 26, 2000, Allstate received and cashed a check from Joe and Bertha Tatum for $54.09. This check was numbered 722 and was referred to as such in the ensuing litigation. It was dated July 10, 2000, signed by Bertha Tatum, and written on the Tatum's Warren Federal Credit Union account. The jury found that this check was actually mailed after the August 9 accident.

On September 6 Bertha Tatum personally delivered another check in the amount of $49 to the Tebow Agency. This payment was the balance of the annual premium. On that same day Allstate received its first notice of the accident.[3]

The file was assigned to Allstate employee Beth Lancaster. On September 11, 2000, Lancaster wrote Joe and Bertha Tatum, stating that according to Allstate's records the policy was "in cancellation status" as of the date of the accident. Lancaster noted that the Tatums had advised her that the payment had been mailed on time and that this claim was being investigated. On October 9, 2000, Allstate mailed a letter to Joe and Bertha Tatum stating that the policy had been cancelled as of the August 9, 2000 acci-

---

1. This fact was contested but the jury so found in a special verdict that is not challenged on appeal.

2. The reinstatement notice provided in relevant part: "Your policy was cancelled effective at 12:01 a.m. Standard Time on July 15, 2000. Your policy was reinstated at 12:01 a.m. Standard Time on August 15, 2000."

3. This fact was also contested and resolved by the special verdict.

dent and that Allstate would not pay claims arising out of the accident.

The Tatums remained in contact with Allstate in an effort to attempt to convince Allstate that check number 722 was timely mailed. On January 23, 2001, Bertha Tatum faxed to the Tebow Agency what purported to be checks number 721 and 723 written on the Warren account. Check 721 showed that it was written on June 8, 2000, and check 723 indicated that it was written on July 10, 2000. One could infer from these checks that check 722 was therefore written on or before July 10. During the ensuing litigation Allstate learned that the copies of the checks that had been faxed to its agent had been altered with the dates and other information changed. Ultimately both the jury and the court concluded that the checks supplied by Joe and Bertha Tatum had been falsified.

Meanwhile, Casey Amos and John Tice hired attorney Steven Smith to represent them in personal injury claims against Jack Tatum. Amos's suit against Tatum was filed in May 2001 and Tice's was filed in October of the same year. Tatum consulted counsel who advised him that filing for bankruptcy might be advisable in light of Allstate's position that the accident was not covered. Alternatively, counsel suggested that bankruptcy might be avoided if Amos and Tice would accept a confession of judgment and an agreement to proceed against Allstate based on an assignment of any claim that Jack Tatum might have against Allstate for declining coverage. Smith, on behalf of Amos and Tice, refused to accept a confession of judgment and suggested instead that Jack Tatum simply allow default judgments to be taken against him. This proposal was agreed to. After hearings at which only each plaintiff testified, the superior court entered default judgments in favor of Amos and Tice. Amos's judgment amounted to $100,000 and Tice's was more than $1,000,000. Jack Tatum had not tendered the defense of the suits to Allstate and Allstate had received no notice of them.

## II. PROCEEDINGS

In July 2002 Jack Tatum filed a complaint against Allstate and Beth Lancaster.[4] This complaint forms the basis for the case presently under review. Tatum alleged breach of contract, negligence, and bad faith, and asked for compensatory damages including the amount of the two judgments entered against him and punitive damages. Allstate answered, denying breach of contract, negligence, and bad faith, and asserted a number of affirmative defenses.

In November 2002 Allstate took the depositions of Jack, Joe, and Bertha Tatum. Jack was represented by counsel but Joe and Bertha were not. Allstate questioned the Tatums concerning representations that they had made on their application for insurance. Allstate had already notified the Tatums of its position that the accident was not covered because of its cancellation for late payment. But Allstate had not told the Tatums that it was interested in developing facts that might show that material misrepresentations were made on the application that could result in the policy being declared void *ab initio*.

As the litigation progressed, Amos, Tice, and Joe and Bertha Tatum were added as parties. Amos and Tice asserted claims directly against Allstate as partial assignees of Jack Tatum. Allstate added a counterclaim against the Tatums for material misrepresentations in the application for insurance and for fraud in the claims process. Allstate sought as relief a declaration that the policy was void *ab initio*, or, alternatively, void because of fraud on the part of the Tatums during the processing of the claim. Allstate also sought a declaration that there was no coverage for the August 9, 2000 accident based on the cancellation of the policy effective July 15, 2000. Once joined, Joe and Bertha Tatum counterclaimed against Allstate for bad faith, malicious prosecution, and abuse of process.

A number of motions for summary judgment were made during the pretrial proceedings. Most relevant to our decision here is

---

4. Allstate and Lancaster were defended by the same attorneys; unless otherwise indicated we refer to them collectively as "Allstate."

Jack Tatum's motion for partial summary judgment of March 26, 2003, seeking a ruling that the policy was in effect on August 9, 2000, because of Allstate's acceptance of payments subsequent to the accident. With respect to this motion, the court ruled that "Allstate waived any claim that the premium was not paid on time because Allstate accepted the premium payment and the policy did not contain a provision allowing for a lapse in coverage." The court explained:

The parties focus on acceptance of check 722 as the relevant one for waiver purposes. But given the case law, the focus must be on the partial payment on August 14 of $51.67, for it was that payment that reinstated the policy. Indeed, given the subsequent billing and payment history, Allstate basically accepted that payment as the payment that should have been made on July 15. After they made their May payment, the Tatums had to pay four more premiums: June, July, August and September. The June payment was not made, and so two payments had to be made by July 15. Bertha made one such payment; whether she made the second one on time (check 722) is in dispute. Assuming for present purposes that check 722 did not arrive in July, then only the June payment had been made as of July 15. There were three more payments: August 14, August 26, and September 6. The latter payments were made after Allstate notified the Tatums that two payments remained due. Those payments accordingly must be deemed to be the August and September premiums, which entails that the August 14 payment was a late payment of the July premium.

Allstate relies on the fact that it conditioned receipt and acceptance of the August 14 payment upon a lapse in the premium, but that condition cannot have any force or effect for at least two related reasons. First, the case law indicates that the condition must be in the policy itself. Second, by seeking to impose a lapse in the policy when accepting the payment when no provision authorizing such a lapse appears in the policy, Allstate has effectively amended the policy; and this it may not do.

The case law speaks in terms of both waiver and estoppel. Whichever term is used, the fact remains that having accepted and cashed the August 14 payment, Allstate may not now argue that the policy lapsed. This conclusion is buttressed by Allstate's subsequent behavior, for Allstate cashed check 722 on August 26 and credited it to the remaining amount that was due, and it accepted a final payment on September 6. Allstate thereby was fully paid on the premium, which was to provide an entire year of coverage. Allstate cannot properly accept that full payment, but only impose a one-month lapse in coverage that is not contained in the policy.

The court recognizes that the short table indicates that Allstate is entitled to keep the entire premium once the policy has been in effect for 148 days. But again, the policy does not authorize Allstate to require a lapse in the policy. The short table is best read instead as a statement to the policy holder as to what refund he or she can expect should the policy be canceled for the three reasons set forth in the policy.

The court also is cognizant of the case law holding that an insurance company can decline to cover a loss which is incurred between the termination and payment dates. *See, e.g., Dolan v. Utica Mut. Ins. Co.*, 650 F.Supp. 851 (D.Mass.1986). But it is virtually impossible to square this doctrine with the general rule disfavoring lapses in a policy if the payment is unconditionally received. After all, the only reason why the issue of a lapse arises is because there was a loss during the period of the alleged lapse. If the company could always refuse coverage during the lapse, there would be absolutely no point to the well-settled rule against allowing a lapse upon unconditional receipt of the late payment. The court accordingly declines to apply the rule articulated in *Dolan*. (Footnote omitted.)

In sum, by receiving and accepting the August 14 payment, as well as cashing the August 26 and September 6 payments, Allstate may not now contend that the policy lapsed between July 15 and August 15,

2000. It therefore could not properly deny coverage of the accident on the grounds that the policy had lapsed. There being no facts in dispute on this issue, plaintiff is entitled to partial summary judgment on this score.

Earlier, in support of the proposition that provisions authorizing a lapse in coverage for nonpayment must be set forth in the body of the insurance policy, the court cited a treatise on insurance as follows:

> In the absence of a controlling statutory or contract provision to the contrary, the general rule is that an insurer which receives, accepts, and retains past-due premiums, assessments, or dues, paid subsequent to the expiration of the grace period, if any, renews the contract and waives the forfeiture for nonpayment, provided such acceptance is unconditional and the material facts are known to the insurer.[5]

In explanation of the relevance of this language, the court stated:

> The case law cited in Couch indicates that the relevant conditions must be set forth in the policy. *Compare, e.g., Mixson v. Allstate,* 388 So.2d 608 (Fla.App.1980) (no provision for lapse in policy), *with Gurley v. State Farm,* 101 Ill.App.3d 619, 57 Ill. Dec. 236, 428 N.E.2d 916 (1981) (policy stated that no lapse if payment made within 10 days after termination date).

Although the court's ruling mooted the issue of when check 722 was mailed, the court recognized that its ruling that Allstate could not deny coverage on the ground that the policy had lapsed was one of first impression in Alaska and it might be reversed on appeal. To avoid the need for a new trial in that event, and because a jury trial was necessary on other issues, the court ruled that the trial jury should also address and decide issues related to check 722.

In a later pre-trial order the court ruled that Allstate had breached its duty to the Tatums by deposing them in 2002 concerning questions in the application for insurance without first notifying them that it was interested in claiming that the application contained material misrepresentations. As a remedy the court ruled that Allstate was precluded from claiming that the policy was void *ab initio* based on material misrepresentations in the application.

At the conclusion of the trial, the jury entered a special verdict that determined that Bertha Tatum mailed check 722 after the accident and Allstate received it on August 26, 2000. The jury also determined that Allstate was first notified of the accident on September 6, 2000, and first gave notice that it would not cover the accident on October 9, 2000. The jury found that Lancaster was not negligent and that Allstate did not act in bad faith. The jury also determined that Bertha and Joe Tatum had made material misrepresentations by providing falsified documents to Allstate and that the default judgments obtained by Amos and Tice were collusive and obtained by a fraud on the court. Further, the jury determined that the amounts of the default judgments were not reasonable and that reasonably Amos should have received $20,000 and Tice should have received nothing. Finally, the jury found that Jack Tatum had suffered damages of $5,000.

Tice and Amos moved for judgment notwithstanding the verdict. The court granted their motion in part, overturning the special verdict insofar as it held that the default judgments were the product of fraud and collusion, and as to the reasonable amount of the judgment that Tice should have received. The court changed the jury's zero determination to an award of $35,389.49.

Allstate was thus ordered to pay $5,000 to Jack Tatum, $20,000 to Amos, and $35,389.49 to Tice, plus prejudgment interest. With respect to attorney's fees and costs, the court ruled that Jack Tatum, Tice, and Amos were not prevailing parties as against Allstate. The court ruled that Allstate was the prevailing party as against Joe and Bertha Tatum and that Beth Lancaster (separately) was the prevailing party as against Jack Tatum, Tice, and Amos. With respect to Lancaster's fees and costs, the court limited them "to those matters that directly involved her," noting that it "would be unfair and inappropriate to

---

**5.** 5 Couch on Insurance § 78:43 (3d ed.2003).

award fees that really were incurred by Allstate in defending [the] case." Using these limitations, the court awarded Lancaster fees of $8,495. Allstate was awarded attorney's fees of $14,736 against Joe and Bertha Tatum. This represented an enhanced fee of fifty percent of actual fees—thirty percent is the norm [6]—because the court found that Joe and Bertha Tatum's fraud "led to unnecessary work."

All parties appeal.

## III. DISCUSSION

We here summarize the parties' points on appeal, reframing and combining points where it seems appropriate to do so.

On appeal Allstate contends

(1) that the court erred in ruling that Allstate was precluded from reinstating the cancelled policy with a gap in coverage;

(2) that the court erred in refusing to declare the policy void *ab initio* because of misstatements in the insurance application; and

(3) that the court erred in granting judgment notwithstanding the verdict as to the jury's findings that the default judgments were the product of fraud and collusion.

Amos and Tice contend

(1) that Allstate should be liable for the entire amount of the default judgments, not merely the amounts found to be reasonable; and

(2) that they were prevailing parties as against Allstate and therefore were entitled to an award of attorney's fees under Civil Rule 82.

Joe and Bertha Tatum contend

(1) that issues concerning check 722 should not have been submitted to the jury;

(2) that their counterclaims for malicious prosecution and abuse of process should not have been dismissed;

(3) that they were entitled to actual reasonable attorney's fees; and

(4) that Lancaster should not be regarded as a prevailing party since it was her action "that precipitated the breach."

Jack Tatum contends that Allstate should be liable for the whole amount of the default judgments.

### A. There Was No Coverage for the August 9 Accident.

We turn first to Allstate's contention that the court erred in ruling that Allstate was precluded from contending that the policy was not in effect on the day of the accident. The superior court ruled on this claim as a question of law, acknowledging that if its ruling on the applicable law was not accepted on appeal, certain facts would be relevant. As the case is now presented, those facts have been determined by the jury. Thus the question before this court is whether based on the established facts Allstate should be precluded from contending that the policy was cancelled on July 15 and reinstated on August 15 and that there was therefore no coverage for the August 9 accident. As presented, this claim is a question of law which we review de novo, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[7]

Allstate's position on this issue starts with the proposition that the policy was properly cancelled on July 15. After the policy was cancelled Allstate contends that it had a right to either reinstate or refuse to reinstate the policy and that if it reinstated the policy it could do so on any terms mutually agreed to. According to Allstate, "[b]ecause the policy did not obligate Allstate to reinstate the policy under any circumstance, Allstate was free to impose conditions upon any request for reinstatement, just as the Tatums were free to reject the conditions and look elsewhere for insurance coverage." It follows, Allstate argues, that the condition imposed by the conditional receipt and the reinstatement notice—that there would be no coverage between July 15 and August 15—was effective.

6. Alaska R. Civ. P. 82(b).

7. *Petrolane Inc. v. Robles,* 154 P.3d 1014, 1018 (Alaska 2007).

The appellees, on the other hand, generally support the rationale of the trial court.[8]

■ For the reasons that follow we conclude that Allstate's position is correct. Under AS 21.36.220(a)(1) an insurer may cancel an insurance policy for nonpayment of premiums by mailing written notice of cancellation to the named insured at least twenty days before the effective date of cancellation. Allstate's policy provides that it may be cancelled for nonpayment upon mailing notice of cancellation to the insured at least ten days before the date of cancellation. Coverage terminates "on the effective date and hour stated on the cancellation notice." The letters from Allstate of June 16 and June 19, both stating that the policy would be cancelled on July 15, 2000, complied with the method of cancellation set out in the statute and the policy. Therefore the policy was cancelled as of July 15, 2000.

Once Allstate had cancelled the policy, did acceptance of subsequent premiums necessarily mean that coverage was reinstated retroactively to July 15 or could Allstate specify another date as the effective date of reinstatement? The trial court's answer was that retroactive reinstatement was Allstate's only option once it decided to reinstate the policy. The court's reason for this conclusion was that without a provision in the policy authorizing a gap in coverage, a gap may not be required.[9] The court based this conclusion on its interpretation of case law from other states.

■ We think the court has read too strictly what the cases have required. A good summary of what may be regarded as a consensus view of the decision law is the statement quoted earlier in this opinion taken from Couch on Insurance.[10] This statement makes it clear that an *unconditional* acceptance of past due premiums reinstates

coverage, presumably with no time gap. But this statement implies that the acceptance of past due premiums may be conditioned on an effective date for renewed coverage that leaves a gap in coverage. The case law that the superior court relied on is in accordance with this view.

For example, in *Mixson v. Allstate Insurance Co.*, the court made it clear that it was "the unconditional acceptance" of the late payment that "constituted a waiver of the insurer's right to contend the policy has lapsed." [11] Another case cited by the superior court, *Gurley v. State Farm Mutual Automobile Insurance Co.*,[12] likewise does not support the constraint on reinstatement imposed by the superior court. In *Gurley* a renewal premium was due on October 7. When it was not paid the insurer sent the insured

a notice which stated that his policy had expired on October 7, 1974, at 12:01 a.m. The notice further provided that "payment within 10 days after expiration date reinstates this policy as of the expiration date for six months, if paid thereafter, you will be advised if payment has been accepted for reinstatement." [13]

The insured made the payment more than ten days after the expiration date, and the insurer gave an unconditional receipt for the payment, but the court held in accordance with the notice that the payment beyond the ten-day grace period did not reinstate the policy retroactively. The only two other cases cited by the superior court also recognize the rule that when an insurer notifies its insured that acceptance of a late payment will cause the expired policy to be reinstated with a gap in coverage, and the notice is given either before or contemporaneously with the tender of the late payment, the notice will be effective.[14] There are a number of other cases recognizing this rule.[15]

8. *See supra* pages 32–33.

9. *See supra* pages 32–33.

10. *See supra* pages 32–33.

11. 388 So.2d 608, 609 (Fla.App.1980).

12. 101 Ill.App.3d 619, 57 Ill.Dec. 236, 428 N.E.2d 916 (1981).

13. *Id.* at 238, 428 N.E.2d at 918.

14. *See Hennessey v. Dairyland Ins. Co.*, 904 S.W.2d 73, 76 (Mo.App.1995) ("[B]ecause the insurer accepted the late premium without first notifying the insured there would be a gap in coverage caused by late payment, the policy was renewed with coverage effective from the original renewal date without a lapse.") (discussing *Mitchell v. Farmers Ins. Exch.*, 396 S.W.2d 647,

In the present case, the conditional receipt given to Bertha Tatum when she tendered the premium check on August 14, 2000, stated that acceptance of the check would not afford retroactive coverage. The conditional receipt also provided that acceptance of the payment would not reinstate the policy and that notice would be given if coverage was reinstated. The next day Allstate issued notice of reinstatement that defined the gap in coverage as beginning at 12:01 a.m. July 15, 2000, and ending at 12:01 a.m. on August 15, 2000.[16] There seems to be no reason why the conditional receipt and the reinstatement notice should not be enforced in accordance with their terms.

The superior court, however, suggested one possible reason why such enforcement might be inappropriate. Pointing to Allstate's later acceptance of premium checks on August 26 and September 6, 2000, the court observed that Allstate was thereby fully paid for an entire year of coverage and acceptance of the whole premium for one year should estop Allstate from contending that the policy had lapsed for a month.[17] The case law in many jurisdictions holds that an insurer waives its right to insist on a gap in coverage as a condition of reinstatement when the insurer holds onto premiums paid by the insured for the time period for which the insurer denies coverage.[18] If acceptance of the full premium for one year were incon-

652 (Mo.1965)); *Hangley v. Am. Family Mut. Ins. Co.*, 872 S.W.2d 544, 549 (Mo.App.1994) ("Having accepted the policyholder's delinquent premium, the insurance company could not impose on the policyholder an *uncommunicated* condition, i.e., that coverage lapsed during the interval between the payment deadline and receipt of the check. Because the insurance company had accepted the premium without first informing the policyholder that there would be a gap in coverage due to late payment, the policy was renewed without a gap in coverage and was in effect on the date of the accident." (emphasis in original, internal citation omitted) (discussing *Mitchell*, 396 S.W.2d at 651–52)).

15. *See Pajcic v. Am. Gen. Life Ins. Co.*, 419 F.Supp.2d 1380, 1382 (M.D.Fla.2006) ("In the insurance context, Florida courts look to whether an insurer's acceptance of a late payment was unconditional, which would constitute waiver, or whether the acceptance was conditioned on the performance of something else by the insured or the insurer, which would not constitute waiver."); *Am. Nat. Ins. Co. v. Cooper*, 169 Colo. 420, 458 P.2d 257, 262 (1969) ("Under the terms of the policy, the company ... could have required an application for reinstatement and issued a conditional receipt for the tendered premium. Had the company followed this procedure, its contention, that since the accident occurred prior to the payment of the premiums the insured was not covered before reinstatement, would have had considerably more appeal."); *Kansas City Life Ins. Co. v. Johnson*, 480 P.2d 122, 125 (Colo.App.1970) (stating that routine deposit of a late check did not constitute waiver by insurer when insurer "immediately notified the insured that the default existed and instructed the insured that reinstatement was necessary and that if the reinstatement were approved, the remittance would then be applied to the policy premiums."); *Hanson v. Cincinnati Life Ins. Co.*, 571 N.W.2d 363, 368 (N.D.1997) (stating that there is no waiver of an insurer's right to treat a policy as lapsed for nonpayment of a premium "if the insurer conditionally accepts and retains a late premium subject to reinstatement"); *Sedgwick Claims Mgmt. Servs. v. Hayes*, 207 Or.App. 756, 143 P.3d 567, 568 (2006) (holding that letter stating that lapsed policy would be reinstated does not imply retroactive coverage when letter itself noted the gap in coverage).

16. *See supra* note 2.

17. *See supra* page 32.

18. *See Pajcic*, 419 F.Supp.2d at 1382–83 ("[A]n insurer cannot permanently retain the benefits of a late premium and still deny coverage to the insured...."); *Travelers Indem. Co. v. Dana*, 434 So.2d 48, 48 (Fla.App.1983) ("Where ... the insured was injured after the past-due premium had been paid to the insurer, and there was evidence to support the trial court's finding that the insurer retained the past-due premium and was thus estopped to deny coverage, the judgment for the insured will be affirmed."); *Mixson*, 388 So.2d at 609 ("An insurer cannot retain a past-due premium and at the same time claim that a forfeiture of the policy has occurred."); *Kende Leasing Corp. v. A.I. Credit Corp.*, 217 N.J.Super. 101, 524 A.2d 1306, 1314 (App.Div. 1987) (An "insurer's retention of premiums covering a period beyond the effective date of its notice of cancellation (i.e. the insurer's failure to return unearned premiums) estopped the insurer from denying coverage for an accident occurring subsequent to the purported cancellation date." (citing *Englishtown Auction Sales v. Mt. Vernon Fire Ins.*, 112 N.J.Super. 332, 271 A.2d 292 (N.J.Super.App.Div.1970))).

Other jurisdictions have held that an insurer only waives its right to insist on a gap in coverage when the insurer retains the premiums *and* had prior knowledge of the intervening loss. *See Van Hulle v. State Farm Mut. Auto. Ins. Co.*, 44 Ill.2d 227, 254 N.E.2d 457, 460 (1969) ("In many

sistent with providing coverage for only eleven months in this case, there would be a plausible argument in favor of an estoppel.[19] Estoppel requires an assertion of a position by word or deed and when successfully invoked precludes the party making the assertion from taking a position inconsistent with it.[20] But there was no inconsistency here because under the policy the full premium is earned in any year in which the policy is in effect for five months or more.[21] Thus Allstate's acceptance of the full premium did not serve to communicate a position that was inconsistent with a one-month gap in coverage.

For these reasons, the superior court's decision that the insurance was in effect on the day of the accident was erroneous. As a result, the judgment against Allstate should be reversed. As this conclusion moots Allstate's other points on appeal, we turn at this point to the appeals of the other parties.

## B. Amos and Tice's Appeal Is Moot.

Amos and Tice argue that Allstate should be liable for the entire amount of the default judgments taken against Jack Tatum, not merely the amounts found by the jury and court to be reasonable. But since we have concluded that Allstate's policy did not cover the accident, Allstate is not liable for any part of the default judgments. This argument is therefore moot.

Amos and Tice also argue that they were prevailing parties as against Allstate and therefore were entitled to court-awarded at-

torney's fees from Allstate. Again, in light of our conclusion concerning Allstate's appeal, this argument is moot.

## C. The Tatums' Appeal

### 1. Should the issues concerning check 722 have been submitted to the jury?

■ Joe and Bertha Tatum's first point on appeal is that "Joe and Bertha Tatum were not [n]ecessary [p]arties for the [t]rial." Their argument is not that the court erred in joining them as parties but that once the superior court ruled that Allstate was estopped from claiming fraud in the application process and estopped as well from contending that there was a gap in policy coverage, the issues surrounding check 722 should not have been submitted to the jury. Joe and Bertha Tatum claim that submitting these issues to the jury was an abuse of discretion because "advisory opinions are usually to be avoided" and further that it is the "function of the court to simplify, not unnecessarily complicate, the issues for trial."

In response Allstate argues that the questions as to when check 722 was mailed and whether Joe and Bertha Tatum committed fraud in trying to convince Allstate that it was mailed before the accident were not merely conditionally relevant. Allstate points to a superior court order issued subsequent to the court's decision concerning the conditional submission of the check 722 issues. The later order recognized that the

jurisdictions waiver of a forfeiture has been upheld under certain circumstances where the insurer, with knowledge of an intervening loss, accepts a premium tendered for the purpose of covering the loss." (citing *Alabama Farm Bureau Mut. Cas. Ins. Co. v. Hicks*, 272 Ala. 574, 133 So.2d 221 (1961); *M.F.A. Mut. Ins. Co. v. Quinn*, 259 S.W.2d 854 (Mo.App.1953); *Seavey v. Erickson*, 244 Minn. 232, 69 N.W.2d 889 (1955); *Johnston v. Phelps County Mut. Ins. Co.*, 63 Neb. 21, 88 N.W. 142 (1901); *Cont'l Ins. Co. v. Chew*, 11 Ind.App. 330, 38 N.E. 417 (1894); *Joliffe v. Madison Mut. Ins. Co.*, 39 Wis. 111 (Wis.1875); *Am. Nat. Ins. Co. v. Cooper*, 169 Colo. 420, 458 P.2d 257 (1969))).

19. The appellees might still need to explain why their failure to inform Allstate of the boat accident prior to paying the late premium would not have defeated their claim for estoppel in this

case. *See, e.g., Van Hulle*, 254 N.E.2d at 460 ("In many jurisdictions waiver of a forfeiture has been upheld under certain circumstances where the insurer, *with knowledge of an intervening loss,* accepts a premium tendered for the purpose of covering the loss." (emphasis added)).

20. *See, e.g., Jamison v. Consol. Utils., Inc.*, 576 P.2d 97, 101–02 (Alaska 1978).

21. According to Couch, an "insurer may waive the forfeiture of the entire policy by accepting premiums, reinstating coverage as of the date of the receipt of the payment, and returning the unearned premium for the intervening period of noncoverage." 5 COUCH ON INSURANCE § 78:43 (3d ed.2003). Because of the short-rate table, there was no "unearned premium" that Allstate was required to return.

check 722 issues would be relevant to other issues that would be tried, namely, "whether the Tatums sought to defraud Allstate, whether the investigation was negligent, and whether Allstate's refusal to cover was in bad faith." The court stated in this order:

> Indeed, having evaluated the matter further, it is clear to the court that in fact the jury in all likelihood will have to address and resolve the factual matters raised by Joe and Bertha Tatum. Allstate is claiming that the Tatums tried to defraud Allstate by submitting altered checks 721 and 723—the jury cannot decide this issue without determining when those three checks actually were mailed. Similarly, the date on which Bertha Tatum actually mailed the check is an important element of the competence of Allstate's investigation of the matter, and both the date the check was mailed and the date that Allstate learned of the accident will undoubtedly figure into the jury's evaluation of whether Allstate denied coverage in bad faith.

In so ruling the court did not abuse its discretion. Similarly, even if the issues surrounding check 722 were merely of conditional relevance, we would not find that the court abused its discretion by ordering them tried because doing so held the potential to avoid a

second trial and involved only limited additional costs.[22]

## 2. Did the court err in dismissing the counterclaims for abuse of process and malicious prosecution?

Joe and Bertha Tatum's second point on appeal is that the court erred in dismissing their counterclaims for abuse of process and malicious prosecution against Allstate. The underlying conduct they complained of relates to Allstate's deposition of them in November 2002. The superior court, as noted, found that

> Allstate breached its duty to defend the Tatums because it did not notify them prior to the deposition that the information it would seek might be used to void the policy altogether. That breach prejudiced the Tatums because Allstate was able to obtain information it later used to void the policy.

There are two elements to the tort of abuse of process: "an ulterior purpose and a 'willful act in the use of the process not proper in the regular conduct of the proceeding.'"[23] "The second element requires 'some overt act done in addition to the initiating of the suit.'"[24] The trial court ruled that the deposition questions concerning the application did not satisfy the willful act element of the tort.[25] We agree. For an insurer to ask

---

22. The court weighed these considerations as follows:

> The issue of whether Allstate was required to cover the accident once it received payment from Bertha Tatum, even if that payment was late and Allstate had not learned of the accident prior to receiving the payment, is one of first impression in Alaska and one over which courts in other states are split. If the court's ruling on this issue is incorrect and the Alaska Supreme Court reverses on this issue, then the normal procedure would be a remand to hold an entirely new trial. Given the narrowness of the issues, the limited testimony required, and the substantial expense involved in a remand, it is entirely appropriate to have the jury deliver a special verdict on these factual issues so that if the Court reversed this court, a remand would not be necessary.

23. *Caudle v. Mendel*, 994 P.2d 372, 376 (Alaska 1999) (quoting *Kollodge v. State*, 757 P.2d 1024, 1026 (Alaska 1988)).

24. *Id.*

25. We set out here the superior court's ruling on this question:

> Plaintiffs' counterclaims makes no reference to a claim of abuse of process. However, given the liberal standards regarding interpretation of pleadings, the court will address the issue. The two elements of abuse of process are "an ulterior purpose" and "a willful act in the use of the process not proper in the regular conduct of the proceeding." *Sands v. Living Word Fellowship*, 34 P.3d 955, 961 (Alaska 2001). The willful act cannot be the filing of the litigation—it must be "a claim that the defendant misused process to attain some separate ulterior purpose independent of the process—for example, to extort the plaintiff and force him to take some action by the use of the process as a threat." *Id.* Thus, in *Sands*, the court rejected a claim that publicizing a lawsuit could not be the requisite willful act as it "did not constitute extortion or coercion." *Id.*
>
> Plaintiffs do not specify the ulterior motive here—presumably, given plaintiffs' pleadings, the motive was to cancel the policy if at all possible. The willful act was deposing Joe and

its insured questions about an application for insurance without advance warning but after it has denied coverage on other grounds is not a sufficient deviation from acceptable litigation objectives to amount to an abuse of process.[26]

■ With respect to malicious prosecution, favorable termination of the proceeding alleged to be malicious is a requirement for any such claim.[27] The trial court properly ruled that this element had not been satisfied.

### 3. The Tatums' other points lack merit.

Joe and Bertha Tatum contend that they should have been entitled to an award of actual reasonable attorney's fees on their claims for abuse of process and malicious prosecution. Our ruling that these claims were properly dismissed moots this contention.

Joe and Bertha Tatum's final point on appeal is that Lancaster should not have been held to be a prevailing party because it was her conduct that caused Allstate to decline coverage. This argument is not well developed. The jury in its special verdict found that Lancaster was not negligent. The argument may be that Lancaster was neces-

sarily negligent because Allstate wrongfully denied coverage. If so, its premise is incorrect in light of our conclusion that Allstate was justified in denying coverage. If another argument is intended, we are unable to determine what it is and it must be considered waived for insufficient briefing.[28]

Jack Tatum claims on appeal that Allstate should have been held liable for the whole amount of the default judgments that he allowed to be taken against him. This point is moot in light of our conclusion that the policy did not cover the accident.

## IV. CONCLUSION

For the reasons expressed above, the judgment of the superior court in favor of Jack Tatum, Casey Amos, and John Tice against Allstate is REVERSED. In all other respects the judgment is AFFIRMED.

BRYNER, Justice, not participating.

Bertha Tatum regarding their application, without giving them notice that those questions would be asked or that their policy could be called into question. The court ruled that this portion of the deposition was improper and that, pursuant to *Lloyd's v. Fulton*, Allstate would be estopped from voiding the policy *ab initio* due to alleged misrepresentations in the application. The court did not, however, specifically term Allstate's action one of bad faith.

The question before the court is whether the deposition questions constitute a "willful act." The difficulty with plaintiffs' claim is that Allstate's questions were not used to compel plaintiffs to take or to refrain from some action—indeed, Allstate did not attempt to force plaintiffs to do anything. Rather, it took what the court found to be some improper actions in the course of an otherwise lawful action, the taking of a deposition. And any advantage All-

state may have attempted to gain from those questions has been negated by the court's ruling that Allstate cannot use the information it gleaned to void plaintiffs' policy *ab initio*. As such, even taking all of their allegations in the pleadings as true, plaintiffs therefore have not made out a *prima facie* case of abuse of process. (Footnote omitted.)

26. We reach this conclusion assuming, without deciding, that such questions violated the insurer's duty of disclosure to its insureds.

27. *Caudle*, 994 P.2d at 375–76.

28. *Wirum & Cash, Architects v. Cash*, 837 P.2d 692, 713–14 (Alaska 1992) ("Where a point is not given more than a cursory statement in the argument portion of a brief, the point will not be considered on appeal.").